**HELLENIC LINES, LTD., Plaintiff-Appellant Cross-Appellee,**

v.

**UNITED STATES of America, and Commodity Credit Corporation, Defendants-Appellees Cross-Appellants.**

**Nos. 186, 901, Dockets 73–1474, 73–1974.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 20, 1974.

Decided March 7, 1975.

John S. Rogers, New York City (Burlingham, Underwood & Lord, New York City, of counsel), for appellant-cross-appellee.

Gilbert Fleischer, Dept. of Justice, New York City (Carla A. Hills, Asst. Atty. Gen., Paul J. Curran, U. S. Atty., S. D. N. Y. and Warren A. Schneider, Dept. of Justice, Admiralty & Shipping Section, of counsel), for appellee-cross-appellant United States.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

This Odyssey concerns a large government shipment of bagged flour from various Gulf ports to United Nations Relief and Works Agency (UNRWA), on plaintiff's vessel, MV Italia, intended to arrive at Aqaba, Jordan, around May 20, 1967. After various delays and peregrinations hereafter described, the shipment finally reached Ashdod, Israel, on July 17, 1967. However tortuous was the voyage, the course of this suit in admiralty to determine the rights of shipowner and cargo has equalled it.

## I. *The Facts.*

The background is recounted in Judge Tyler's findings of fact, which the following summary supplements in some degree:

Defendant Commodity Credit Corporation (CCC) is a Government agency within the Department of Agriculture (DA). Among many other duties it arranges, as agent for the Agency for International Development, transportation of shipments, authorized by 7 U.S.C. § 1721 et seq., to UNRWA for distribution to Palestinian refugees. Early in 1967 CCC called for offers to transport a quantity of bagged flour (some 5449 metric tons ultimately were shipped) from specified Gulf ports to Aqaba, Jordan. Since no United States-flag vessel then available was offered for shipment of the entire cargo, see 15 U.S.C. § 616a, 46 U.S.C. § 1241, Part VI *infra*, CCC entered into two booking agreements with Marine Chartering and Brokerage Corporation (Marine), agent for plaintiff Hellenic Lines, Inc. (Hellenic). The first agreement called for a lifting date of April 22 at Corpus Christi, Texas, aboard the Hellenic Spirit or substitute with an estimated time of arrival (ETA) of May 18 at Aqaba. When Hellenic opted to exercise its right of substitution, a second agreement, evidenced by two separate booking notes dated March 31, was entered into whereby the vessel Hellenic Sky would carry the cargo, which was augmented in size by the amount of similar grain cargo previously agreed to be carried by the Hellenic Sky and was to be lifted at additional Gulf ports; the loading date at the additional ports was to be April 7 (the April 22 date was retained for the Corpus Christi loading) and the ETA was to be May 25. Under either agreement, there was sufficient time to allow the vessels to stop at ports in the eastern United States to pick up other cargo. The freight rate was $20.95 per long ton, full berth terms, and the total freight was $114,301.51, which was to be and was paid shortly after loading. The first rift in the lute occurred when the Hellenic Sky developed mechanical difficulties and was unable to make the voyage. On April 13, K. E. Stewart, president of Marine, took this up with J. M. Cushing of the Department of Agriculture. Stewart proposed substitution

of the Italia[1] to carry the entire shipment, which would take up 80% of the Italia's capacity. Cushing's contemporaneous notes indicate that Stewart promised a sailing from the Gulf ports direct to Aqaba, at a speed of 15 knots and with an ETA of May 20, 1967.

On the next day, after consulting with others in the Department of Agriculture, Cushing decided to accept the substitute "since ETA Aqaba 5 days earlier than originally booked" if Hellenic would pick up any Gulf port charges against the cargo resulting from the delay in shipment. According to his testimony and notes, Cushing called Stewart to inform him that the Department would accept the substitution of the Italia upon the following four terms: (1) Hellenic is responsible for charges against the cargo as a result of later loading dates; (2) The ETA "is at least as good as originally booked"; (3) North Vietnamese and Cuban prrts were to be avoided; (4) Clause 12 of the Hellenic bill of lading would not apply.[2] Cushing then entered in his notes the indication "Stewart agrees."[3] While Cushing and Stewart talked on April 13 about a shipment direct to Aqaba, the conditions to which Stewart agreed on April 14 did not expressly include this, doubtless because both parties knew that the May 20 ETA at Aqaba could be met only by a direct sailing or, at least, without loss of port time at mid-Atlantic United States ports.[4]

The Department and Marine then entered into new booking notes to supersede the preceding ones. These called for loading on the Italia at Corpus Christi, Texas; Lake Charles, Lousiana; Pascagoula, Mississippi; and Mobile, Alabama, on April 24, 27, and 30 and May 1, respectively, with an ETA of May 20 at Aqaba. A typewritten insert excluded application of Clause 12 of Hellenic's bill of lading. Nothing was said about the first or third condition in Cushing's conversation with Stewart.

The Italia did not meet the dates agreed for loading. She departed Corpus Christi on May 5 and did not leave Pascagoula, which became the last of the loading ports, until May 13. Although this twelve-day delay made it apparent that even a sailing direct to Aqaba' would not meet the ETA of May 20, the promise of which had been an inducement to the Government's acceptance of her substitution,[5] the Italia stopped at

---

1. The Italia was a freight liner pursuing an advertised route which called for stops at North Atlantic ports, including New York, and Piraeus and Salonika, Greece.

2. This, among other things, gives port authorities authorization to grant general discharge orders without notice and provides that certain detention charges will be assessed against the "shipper, consignee, receiver and/or owner" if there is delay in the vessel's discharge caused by any of the above parties.

   A standard provision in all of the booking notes partially reinstated a provision of Clause 12 by saying that, "[n]otwithstanding any provision to the contrary in the bill of lading and/or any other document evidencing or relating to this agreement between the carrier and the shipper, any expense which the carrier may incur at destination in connection with the delivery of this shipment as a result of delay to the vessel shall be for the account of the consignee," but made clear that "the carrier agrees that it shall have no recourse against the shipper on that account."

3. Stewart did not testify; his deposition, which was received in evidence, did not contradict in any important respect Cushing's version of the telephone conversation.

4. The Italia was scheduled to depart from the last Gulf port, Mobile, Alabama, on May 1. By Hellenic's own figures, the trip directly from Mobile to Aqaba would involve traversing 6,810 nautical miles; given the Italia's speed of 15 knots, this would take 19 days. If stops at New York and Piraeus were added, the trip would lengthen to 7,357 nautical miles and 20.4 days. Thus, if any time were spent in those ports the Italia would have had difficulty in meeting the May 20 ETA even if she had departed on schedule.

5. Indeed, DA's Cushing testified that the Government could have refused to accept the substitution of the Italia for the Hellenic Sky in the first place since, when the Hellenic Sky was substituted for the Hellenic Spirit for the bulk of what was ultimately shipped, Hellenic Lines retained no additional right of substitution. He testified that he had been concerned

Norfolk, Virginia, and at Brooklyn, New York, for additional non-Government cargo. On May 23 she sailed from Brooklyn not for Aqaba but for Piraeus, Greece, where most of the added cargo was to be discharged. While the distance added by these calls at Norfolk and Brooklyn was only about 375 nautical miles, or about 25 hours in sailing time at a 15 knot speed, the vessel spent 13 hours in Norfolk and more than four days in Brooklyn.

One day out of Brooklyn, while the Italia was experiencing heavy weather, a crack was discovered in the deck plating and water was found in a nearby reefer chamber. Thereafter in heavy weather the vessel traveled at a reduced speed to help avert the onrush of waves on the deck. The Italia also experienced excessive fresh water consumption. In consequence she was instructed by Hellenic's New York office to put into the Azores to take on additional water and was in port there for more than six hours. She proceeded thereafter without further mechanical difficulty but continued to travel at slower than normal speed whenever the weather so required.

None of the above facts might have been seriously consequential save for an occurrence that no one anticipated. On June 5, 1967, shortly after the Italia passed Gibraltar, the Six Day War broke out between Israel and a number of Arab nations. The Suez Canal was immediately closed to traffic. On June 10 major hostilities ceased, pursuant to a resolution of the United Nations Security Council.

Various telephone conversations were had between the parties concerning the disposition of the flour, without an agreement being reached. In the afternoon of June 7 Hellenic sent a telex to J. A. Ryan of the DA, stating that the Italia had arrived at Piraeus and that, in view of the hostilities in the Middle East, "we are left no other alternative but to discharge the cargo at Piraeus, in which case the respective conference rate of freight is applicable"—a rather shocking position since the conference rate to Piraeus was $216,053.74, or 89% more than the agreed rate to Aqaba, a port which the Italia should have reached a fortnight before the war began.[6] In fact the Italia had neither arrived at Piraeus as stated in the telex nor was "close by" as Pericles Callimanopulos, Hellenic's president and general manager, testified; her log showed that at 0820 she passed Cape Sarrat in Algeria and she did not pass Cabo Passero until early on June 8.[7] In accordance with instructions from AID, Ryan asked Callimanopulos to secure discharge of the flour at Beirut, Lebanon; Callimanopulos declined, properly enough at the time, on the ground that Beirut was in the war zone. Ryan then requested discharge in Turkey as an alternative;[8]

that the Italia might arrive in Aqaba too late for the Government's needs, but he said that he agreed to Hellenic's request based upon his assessment that Hellenic was "having some honest difficulties" and Stewart's assurances that the Italia would depart direct for Aqaba and would arrive there with an ETA five days earlier than the Hellenic Sky.

6. Hellenic's President, Pericles Callimanopulos, explained that the rates were higher to Piraeus, notwithstanding that it was a closer port, because carriers allegedly had greater hope of obtaining return cargo in the Red Sea than in the Eastern Mediterranean.

7. Callimanopulos sought to excuse the error in the telex on the not very convincing ground that the Italia would have arrived at Piraeus on June 7 but for the slower speed resulting from the damage to her deck plat-

ing. There is no evidence that any steps were ever taken to rectify the misstatement.

8. The attractiveness of Turkey is claimed to have been two-fold. AID could have used the flour for a program in that country or could have trucked the flour to Beirut or some other place where it would be available for the Palestinian refugees. If ports in southeastern Turkey, such as Iskenderun, were unavailable, as they probably were while the war was in progress, it is hard to understand why trucking the long distance from Izmir, the Turkish port most discussed, was deemed superior to later sea shipment from Piraeus, unless it was supposed that the war would be of long duration—a supposition having scant factual basis on June 9. In the view we take of the case, the controversy about discharge at Piraeus rather than Izmir becomes irrelevant.

Callimanopulos refused this also, saying that he was going to discharge at Piraeus.

The Italia reached Piraeus at 1645 on June 9. On the same day Stewart addressed two self-serving telexes to Ryan. One purported to "confirm your statement that the cargo of flour on board MV Italia for Aqaba . . . should be discharged at Piraeus." The other said, "Hellenic Lines agree discharge cargo Piraeus." Both took a more moderate stance on the freight, saying that this would be referred to the conference. Ryan, who was preoccupied with the many transportation problems arising from the war, did not answer either telex. He claimed to have found them confusing in that they were sent by Stewart while he had been negotiating with Callimanopulos. In any event, he deemed Callimanopulos' mind to be closed. Apparently there was no discussion about the Italia's simply remaining at Piraeus for a few days and awaiting developments.[9] The Government's failure to suggest this could well have been due to the belief induced by Hellenic that the Italia had reached Piraeus on June 7. The district judge found, and we entirely accept his finding, that the Government never agreed to a discharge at Piraeus but simply bowed to Callimanopulos' determination to do this whatever it might say.[10] Discharge of the flour began on June 10 and was completed on June 26, the cargo being received by the Piraeus Port Authority.

Subsequently the Government advertised for bids to move the flour from Piraeus to Ashdod in southern Israel, apparently the port closest to Aqaba that could be reached without transiting the Suez Canal.[11] All the bids were from foreign-flag vessels, the most likely selection being the Satko of Orient Mid-East Lines, which offered a rate of $14.25 per long ton. Instead of accepting this bid the Government arranged for transportation on an American-flag vessel, the S.S. Whitehall, which turned out to be available, at a rate of $26.00 per long ton. The district court found that the freight on the Whitehall was $140,178.71 and the port expenses at Piraeus were $27,499.56, for a total of $167,678.27.

## II. *The Proceedings in the District Court and the Claims on Appeal.*

We will never know whether the courts would have been faced with the problems here presented if Hellenic had been willing to let well enough alone—keeping the prepaid freight but leaving the Government with the expenses incurred at and from Piraeus. Instead it began this suit in admiralty in the District Court for the Southern District of New York, seeking to recover $101,-102.03, the excess of the conference rate to Piraeus over the negotiated rate for the longer voyage to Aqaba, which was outside conference territory. Naturally this provoked a counterclaim by the Government. The theory of the counter-

**9.** By June 9 it had become apparent that a cease-fire was not far off. Jordan had accepted the cease-fire call and Israel had agreed to accept it if the Arab states did. The New York Times, June 8, 1967, page 1, col. 3. On June 9 it was reported that both the United Arab Republic and Syria had announced willingness to accept a cease-fire. The New York Times, June 9, 1967, page 1, col. 8, page 18, col. 5. The cease-fire became a reality on June 10 when Israeli and Syrian forces disengaged. The New York Times, June 11, 1967, page 1, col. 4. Delivery would have been possible a few days later at Beirut or other ports in the eastern Mediterranean.

**10.** This interpretation is confirmed by a memorandum for the files dictated by Ryan on

June 12. The Government suggests that Hellenic's decision to discharge at Piraeus was motivated not only by convenience (including the discharge of the cargo destined for that port) but by the hope of obtaining the higher conference rate to Piraeus and the need to perform repairs in the home port to the Italia's cracked plating and other parts; these were performed from June 12 to June 24.

**11.** Ashdod is within easy trucking distance of the Gaza Strip where there were large numbers of Palestinian refugees. The record does not disclose whether trucking from Ashdod into Jordan had become feasible when the flour arrived.

claim was that Hellenic had failed to perform the freight contracts in that it had diverted the Italia to Piraeus and discharged the cargo under the Government's protest; it was therefore liable for the extra cost of transshipment, transportation and port charges, plus certain damage to the cargo, a claim that seems to have disappeared; the total *ad damnum* was estimated at approximately $231,755.93. The counterclaim said nothing about recovery of prepaid freight. The pretrial order listed the Government's principal contentions as being that it had not agreed to the discharge at Piraeus; that this was for Hellenic's convenience and was unreasonable under the circumstances; that Hellenic had breached the contract of carriage by failing to meet the dates agreed for loading and for arrival at Aqaba; that the stops at Norfolk and Brooklyn constituted a deviation entitling the Government to recover on its counterclaim for damages sustained as a result of the delay in the Italia's arrival in the Mediterranean; and that Hellenic was liable for damage to the cargo due to failure to use due diligence to make the Italia seaworthy. The list of issues did not include any suggestion that the Government might be entitled to recover the prepaid freight in addition to the damages sought in its counterclaim.

▇▇▇ However, the issue of the prepaid freight became a dominating point in the opinion of the district judge. He correctly stated that "under American maritime law, contrary to the British view, prepaid freight is not 'earned' until delivery", citing National Steam Navigation Co., Ltd. v. International Paper Co., 241 F. 861, 862 (2 Cir. 1917). See The Kimball, 70 U.S. (3 Wall.) 37, 44–45, 18 L.Ed. 50 (1866); The Gracie D. Chambers, 253 F. 182, 183, 184 (2 Cir. 1918), aff'd sub nom. International Paper Co. v. The Schooner "Gracie D. Chambers", 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919); The Fredensbro, 52 F.2d 854, 855 (3 Cir. 1931); Poor, Charter Parties and Ocean Bills of Lading § 29, at 80 (5th ed. 1968). Again correctly he pointed out there were exceptions to the "American rule", notably when the parties had agreed that freight was considered as earned when paid, usually expressed in a "ship and/or cargo lost or not lost" clause in the bill of lading, which he thought not to have been present here. See The Gracie D. Chambers, *supra*, 253 F. at 183; Poor, *supra*, § 29, at 81. Turning to the liberties clause in the bill of lading,[12] he noted that such clauses

---

12. Clause 5 provided in pertinent part:

Without limitation of any other provision herein, in any situation whatever or wherever occurring and whether existing or anticipated before commencement of, or during the voyage, which, in the judgment of the carrier is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to, or loss of the ship or any part of the cargo or to make it unsafe, imprudent or unlawful for any reason to commence or continue the voyage, or to give rise to delay or difficulty in arriving, entering, discharging at or leaving the port of discharge or the usual or intended place of discharge in such port, the carrier, before loading or before the commencement of the voyage, may require the shipper or other person entitled thereto, to take delivery of the goods at port of shipment and on their failure to do so, may warehouse the goods at their risk and expense; or the carrier, whether or not proceeding toward or attempting to enter the port of discharge, may proceed by any route or return directly or indirectly to or stop at such other port or place whatever as the carrier may consider safe or advisable under the circumstances, once or oftener, backwards or forwards in any order and discharge the goods at any place he may select there, or the carrier may retain the cargo on board until a return trip or until such time as the carrier thinks advisable and discharge the goods at any place whatever as herein provided, or the carrier may discharge and forward the goods by any means whatever, all at the risk and expense of the goods. The carrier is not required to give notice of discharge or forwarding. Whenever the goods are discharged from the ship they shall be at their own risk and expense. Such discharge shall constitute complete delivery and performance under this contract and the carrier shall be free from any further responsibility. The carrier shall be entitled to a reasonable extra compensation for any services in connection with the foregoing above the agreed freight.

have been strictly construed, since a literal construction might permit virtually any deviation, see Gilmore & Black, Admiralty § 3–40, at 178 (1975), that they excuse only those deviations which are "reasonable," Surrendra (Overseas) Private, Ltd. v. S.S. Hellenic Hero, 213 F.Supp. 97, 101 (S.D.N.Y.), aff'd on the opinion below, 324 F.2d 955 (2 Cir. 1963), and that any deviation for the purpose of off-loading cargo was presumed to be unreasonable, Surrendra, supra, 213 F.Supp. at 101. See 46 U.S.C. § 1304(4). The district judge considered that what he deemed to be a deviation to Piraeus was unreasonable, in that the Government had not consented to it and Piraeus was in any event not the nearest practicable port where the commercial purpose of the transaction could be served, the Turkish port of Izmir being superior in that regard, and consequently held that the freight was unearned and could be recovered by the Government. Beyond that, with respect to the Government's counterclaim, he observed that "the carrier is obliged to either forward the goods himself or reimburse the shipper for expenses incurred in transportation," and he considered this rule to be applicable even when, "because of failure to deliver, the carrier is ordered to reimburse prepaid freight." The court held further that Hellenic was not even entitled to retain any part of the prepaid freight on a basis of pro rata itineris, since the Government had never agreed to accept the goods at this intermediate port. See Propeller Mohawk, 75 U.S. (8 Wall.) 153, 161, 162, 19 L.Ed. 406 (1869); Longley, Common Carriage of Cargo § 20.02 [3], at 232 (1967); Poor, supra, § 30, at 84. Being in doubt whether Hellenic should be saddled with the additional costs entailed by the Government's decision to forward by an American-

rather than a foreign-flag vessel and whether transshipment to Ashdod was reasonable, the court directed a further hearing on these issues.

Counsel for Hellenic promptly informed the judge that he had been in error with respect to the non-existence of a "ship and/or cargo lost or not lost" clause in the bill of lading.[13] At the beginning of the reopened hearing, the judge asked the Government to respond. Counsel referred to breaches of the contract of carriage both by "going up to New York" and by discharging private cargo at Piraeus—acts which he considered would disentitle Hellenic to rely on "exculpatory clauses." The court thereupon ruled that Hellenic could not take advantage of the "ship and/or cargo lost or not lost" clause with respect to the discharge at Piraeus because it "was unreasonable or was a deviation in that it had regard for the interest of only one party, to wit, Hellenic." In additional findings of fact and conclusions of law, it held that Ashdod was a reasonable port for transshipment but that the Government was entitled to recover only for the lower rate available on foreign-flag vessels whose bids fully complied with the terms advertised. Judgment was ultimately entered against Hellenic for $114,301.51, the prepaid freight, and $107,299.56, the sum of the port expenses at Piraeus and the estimated cost of shipment to Ashdod on a foreign vessel, for a total of $221,601.07 with interest from various dates in 1967.

■ It is understandable that an outcome whereby the Government would receive free transportation of the cargo (except for its self-imposed burden of effecting onward shipment from Piraeus on an American-flag vessel)—something which it had not sought in its counter-

13. Clause 16 provided in part:
Full freight to port of discharge named herein shall be considered completely earned on receipt of the goods by the carrier, whether the freight be stated or intended to be prepaid or to be collected at destination; and the carrier shall be entitled absolutely to all freight and all charges due hereunder, whether actually paid or not, and to receive and retain them under all circumstances whatever, ship and/or cargo lost or not lost. If there shall be a forced interruption or abandonment of the voyage at the port of shipment or elsewhere, any forwarding of any part of the goods even if by another ship of the carrier, shall be at the risk and expense of the goods.

claim—should have led Hellenic to believe that something had gone wrong on its way to the forum. The original claim that it is entitled to the higher conference rate for carrying the cargo to a place where the Government did not wish it to be carried or discharged has largely gone to its well-deserved fate; we have been cited no authority in support of the proposition that, even when discharge at a port other than the agreed destination has been properly effected under the "liberties clause," a carrier is entitled to compensation at a conference rate for that point which is higher than a negotiated rate for a more remote one.[14] The liberties clause in Hellenic's bill of lading, see note 12, *supra*, provides only that

> The carrier shall be entitled to a reasonable extra compensation for any services in connection with the foregoing above the agreed freight.

Hellenic rendered less service, not more. Hellenic's main interest now is not in recovering but in resisting the Government's recovery. The Government not only asserts its entitlement to every dollar of its unclaimed and unanticipated victory but has appealed from the disallowance of the differential of the cost of American over foreign-flag transshipment between Piraeus and Ashdod.

If we were to essay the simplest and most effective statement of Hellenic's case, it would run somewhat as follows: Under Clause 16 the freight was earned when paid and the district court should have changed its ruling which had permitted the Government to recover the prepaid freight when the clause was called to its attention. Even if we accept the court's finding that the Government had not agreed to discharge at Piraeus, as we do despite Hellenic's contention that it is plainly erroneous, the discharge was within the liberties clause, which permitted the carrier, "in any situation . . . during the voyage, which, in the judgment of the carrier is likely to make it unsafe . . . to continue the voyage . . . [to] proceed by any route . . . to . . such other port . . . as the carrier may consider safe . . . and discharge the goods" at their own risk and expense. See note 12 *supra*. This expressly relieved Hellenic from liability for any further costs. Hence the Government should take nothing on its counterclaim.

■■ Except for the question whether the Government was entitled to a discharge at Izmir rather than at Piraeus, and our own thought, not advanced by the Government, either in the district court or here, see note 9, *supra*, that the most reasonable course on June 9 and 10 was to do nothing at all and await the by then likely early cease-fire, we would find much force in this argument were it not for one important set of facts. This is that, in our view, Hellenic had engaged in a voluntary unreasonable deviation on this side of the Atlantic by adding about one day of sailing time and almost five days of port time to the delays already occasioned by the final loading of the Italia at the last Gulf port some twelve days after the promised date.[15] We think that because of this

---

14. Indeed, one of the cases cited to us by Hellenic is authority for the proposition that the Government as a shipper may secure through competitive bidding special volume discount contracts to conference ports. American Export Isbrandtsen Lines v. FMC, 127 U.S.App.D.C. 62, 380 F.2d 609, 620 (1967). Swedish-American Line, 8 F.M.C. 142 (1964) is plainly inapposite. There the FMC ordered a partial refund to a shipper who had relied upon rates on a commodity published in a prior conference tariff but inadvertently omitted from the current tariff. The carrier had charged a higher rate and shortly thereafter the conference corrected its oversight, reinserting substantially the earlier rate. Relief was granted to "relieve an innocent shipper of the carrier's failure to file a proper rate." *Id.* at 143.

15. Hellenic claims that the Government did not raise this deviation issue on appeal. However, the record shows that the Government did raise this issue below at the pretrial conference, in its proposed conclusions of law, and in its Post-Trial Memorandum, although only in the context of an argument in support of its counterclaim for damages—recovery of prepaid freight not being then at

the Government was entitled to recover the prepaid freight or to require Hellenic to pay for the port expenses at Piraeus and the reasonable cost of onward carriage—but not both.

### III. *Recovery of Prepaid Freight—and herein of Deviation.*

■ We go along with Hellenic's argument that, when the Government agreed to shipment on the Italia, it accepted a substituted contract precluding reliance on Hellenic's failure to furnish the Hellenic Spirit and the Hellenic Sky on the dates originally agreed. We also shall assume *arguendo* that, although it could have refused to accept the late loading of the Italia, the Government by making the shipment without reservation of rights waived any claims for delayed loading as such. But we see no basis for concluding that the Government waived the agreement for expedited delivery to Aqaba—not, indeed, by May 20, which was impossible in light of a sailing from the last of the last of the Gulf loading ports as late as May 13, but by the earliest possible date.

The relevant clause in COGSA, § 4(4), 46 U.S.C. § 1304(4), provides:

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo

issue. Deviation was very much a part of the Government's argument on appeal. Since the facts have been fully developed, we see no reason why we must close our eyes to the true deviation simply because on appeal the Government placed its emphasis on the wrong side of the Atlantic.

16. The vessel may omit calling at any port, whether scheduled or not, may deviate from, or change the advertised, usual, geographical or intended route at any stage of the voyage and may proceed beyond or in a contrary direction to the port of discharge and may

or passengers it shall, prima facie, be regarded as unreasonable.

Here the stops at Norfolk and Brooklyn were clearly for the purpose of loading cargo and thus were *prima facie* unreasonable, if they were deviations at all.

■ Hellenic says that the stops (or at least the Brooklyn stop) were not deviations since they had been advertised in the Journal of Commerce as stops on a liner service. It points to Clause 2 in its bill of lading, which provides that the scope of the vessel's voyage includes "usual or customary or advertised ports of call, whether or not named herein." It also points to the language of the liberties clause of the bill of lading, quoted in note 12 *supra*, and the further provision in Clause 3, the pertinent part of which we quote in the margin.[16] The latter argument is unpersuasive. As said in Gilmore & Black, *supra,* § 3–40, at 178, "It would seem hard to 'deviate' from such a voyage." Yet the clear plan of COGSA is to differentiate between reasonable deviations, which are without legal consequences, and unreasonable deviations, which entail serious ones. Any such clause must be construed in light of the carrier's basic duty, § 3(2), to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried" in line with the agreement of the parties. "Thus, it would appear that, even under such a voyage clause . . ., a deviation occurs when the liberties conferred by the clause are pushed beyond reasonableness, *in the light of the carrier's duties to cargo.*" Gilmore & Black, *supra,* § 3–40, at 178 (emphasis supplied). And, under the cir-

proceed to and stay at and load or discharge at any place whatever, as inducements may offer, backwards, or forwards, once or oftener, and may load, carry or discharge cargo at, for or between intermediate or other ports, whether on this voyage or a preceding or subsequent voyage, even though two or more of such voyages may overlap. Any such procedure shall be considered within the voyage herein intended so fully as if specifically described herein. The provisions of this clause are not to be considered as restricted by any words of this contract, whether written, stamped or printed.

cumstances here, the advertising cannot bear the weight Hellenic would place upon it; by the same token Hellenic would have been free to include Salonika as a port of call—something clearly contrary to the understanding of the parties.

■ Hellenic knew of the Government's interest that the flour should reach the refugees late in May.[17] It knew that, even with sailings on the agreed dates, the Italia would be hard put to achieve the May 20 ETA with any departure from a direct course and attendant port time. However, May 20 was an "estimated" time of arrival and not an absolute warranty, see Knauth, The American Law of Ocean Bills of Lading 263 (4th ed. 1953); cf. Petroleum Export Corp. v. Kerr S.S. Co., Inc., 32 F.2d 969, 970 (9 Cir. 1929); Heiskell v. Furness, Withy & Co., Ltd., 4 F.2d 977, 979 (2 Cir. 1925), and stops at Norfolk and Brooklyn might not have constituted unreasonable deviations, at least if the port time were short, if the vessel had sailed on time or nearly so. But matters changed when the Italia's sailing from the Gulf ports was delayed by twelve days. Hellenic then had to choose between doing its utmost to achieve prompt delivery of the 80% of the Italia's capacity represented by the flour or making some added profit by picking up additional cargo at Norfolk and Brooklyn, with a further delay of nearly six days. Having made the latter choice, it must bear the consequences.

Hellenic argues against this that we are not permitted to consider the booking notes or the conversations preceding them since the bill of lading was a complete integration of the contract of carriage.[18] There is, indeed, unelaborated dictum to that effect in The Caledonia, 157 U.S. 124, 139, 15 S.Ct. 537, 543, 39 L.Ed. 644 (1895), where the Court said, in disregarding an earlier memorandum exculpating the carrier:

> the bill of lading can alone be considered as the contract between the two parties, the memorandum being preliminary merely.

Earlier the Court had been more cautious in The Delaware, 81 U.S. (14 Wall.) 579, 601, 20 L.Ed. 779 (1872), where, in rejecting parol evidence of an oral agreement which was reached prior to the issuance of the bill of lading and which permitted on-deck carriage contrary to custom for the shipper's benefit, it said that:

> in so far as [the bill of lading] is evidence of a contract between the parties it stands on the footing of all other contracts in writing, and cannot be contradicted by parol evidence.

(footnote omitted). The issue, in other words, is whether the bill of lading is a complete or only a partial integration of the parties' agreement and, if the latter, what has been integrated.

■ In principle it would seem difficult to believe that carrier and shipper would regard standard forms of bills of lading, even the long forms which are commonly incorporated by reference, as a complete integration of the contract of carriage, especially on such individualized matters as dates for loading and delivery where, as here, they were of particular importance to the shipper. Loading is to be performed before the bill of lading is even to be issued[19] and

17. Hellenic makes some argument that it was never informed that, in the shipment of the flour, time was of the essence. But the refugees needed to eat and the negotiations wherein Hellenic persuaded the Government to accept the substitution of the Italia sufficiently informed it of the Government's interest in arrival of the shipment in late May. See note 5 *supra.*

18. Thus its bill of lading provides that "[a]ll agreements or freight engagements . . . are superseded by this bill of lading," Clause 23, and that "none of the terms of this bill [of] lading shall be considered to have been waived unless by an express written waiver signed by a duly authorized agent of the carrier," Preamble.

19. Under questioning by the court, Callimanopulos acknowledged that "the bills aren't issued until after loading" and that the words "On board," which appear in typewritten form on the face of each of the four bills of

the date of delivery is a function of the loading date. Once the parties have formulated an agreement on these subjects, they are unlikely to think it necessary to repeat this in the bill of lading.[20] To be sure, there is nothing to prevent the addition of a typewritten clause with respect to the delivery date, or of a proviso that the bill of lading is subject to prior agreements, as was done in Hellenic Lines, Ltd. v. Embassy of Pakistan, 467 F.2d 1150, 1154–55 (2 Cir. 1972), and a shipper would better protect his rights by following one or the other of these courses.[21] But Hellenic has come forward with no evidence that this is the customary means for preserving elements of a prior agreement in this field of commerce; indeed, there was testimony that it was the custom of the Department of Agriculture to regard the bill of lading as little more than a receipt for the cargo and that, at least with respect to brokers like Stewart with whom the Department had had an ongoing and successful relationship for some years, the representations made in telephone conversations out of which the booking notes came were "considered firm." Cushing even suggested that "[t]he contract is made on the phone;" while this may be a somewhat extreme position, it is clear that the Department regarded its booking notes as contracts [22] and there is authority for the proposition that booking notes such as these are at least a part of the contractual relationship between the Government and the carrier.[23] Absent evidence that it is the custom in the shipping industry that prior agreement on other particulars in the contract of carriage can be preserved only by express entry on the bills of lading, we hold that the bills of lading did not supersede the booking notes. See 3 Corbin, Contracts § 583, at 471–75 (1960); Restatement of Contracts 2d § 236, Tent. Draft No. 5 (1970).

International Drilling Co. v. M/V Doriefs, 291 F.Supp. 479 (S.D.Tex. 1968), is closely in point and contains a good discussion. International Drilling had contracted for the shipment of a drilling rig from Houston to Benghazi, Libya, arrival guaranteed to be within 21 days after sailing and Benghazi to be the first port of discharge. The bill of lading did not incorporate and was not made subject to the agreement; to the contrary, the agreement said it was "subject and subordinate to all terms and conditions of [the] regular liner form bill of lading." After leaving Houston, the Doriefs traveled first to New York, where she took on cargo, and thence to three Mediterranean ports (one to the east of Benghazi) before delivering the rig 11 days late. International Drilling was awarded damages for the delay. Although International's time problem was more acute than the Government's here, the only distinction we find at all significant is that in that case the bill of lading was issued after the goods were on board and the court placed some reliance on the shipper's inability to change the contract after the rig had been loaded and was out of its control, whereas in our case, although the bills of

lading covering this shipment, were an indication that the cargo had already been loaded on the vessel.

**20.** Cf. 1 Carver, Carriage by Sea § 59, at 48–49 (12th ed. 1971):

*Terms omitted by bill of lading.* The bill of lading *purports* to be a statement of the contract; and it would be anomalous and inconvenient that a formal document, accepted by the parties, and apparently expressing the relation between them, should be only evidence, liable to be rebutted, of that relation. On the other hand, the bill of lading is not usually signed until after the goods have been shipped; and it sometimes happens that it contains terms not agreed upon at the time of shipping, or that it varies or omits some of the terms as then understood.

**21.** Indeed, as noted earlier, the Government does protect itself against the operation of Hellenic's Clause 12 by specifically excepting it on the face of the bill of lading.

**22.** The two booking notes covering the shipment aboard the Italia both contained the notation that "[t]his supersedes Contract No. [referring to the previous booking note for shipment aboard the Hellenic Sky]."

**23.** United States v. Central Gulf Steamship Corp., 340 F.Supp. 473, 484 (E.D.La.1972).

lading were also issued after the cargo was on board, the Government some time earlier had filled them out, using Hellenic's blank form. Presumably, however, International Drilling knew pretty well what the bill of lading would be and had clearly agreed to it in advance. Cf. 1 Carver, *supra*, § 61, at 52. It is clear that the Government did not intend to abandon rights under the booking notes, and the days when wooden application of the parol evidence rule was allowed to produce results contrary to the parties' intention have long since passed.

■ We hold therefore that in light of the understanding of the parties and Hellenic's delay in furnishing the Italia for loading, the stops at Norfolk and Brooklyn to take on cargo constituted a voluntary unreasonable deviation.

■ In his well-known opinion in The Louise, 58 F.Supp. 445 (D.Md.1945), Judge Chesnut held that, when a voluntary unreasonable deviation caused the ship to be requisitioned for other purposes while it was in port for foreseeably necessary repairs [24] so that the voyage could not be completed, the shipowner was not entitled to retain prepaid freight notwithstanding a "ship lost or not lost" clause in the bill of lading. We see no significance in the point that the immediate cause of the frustration of the Italia's voyage was the Six Day War, an event over which Hellenic had no control and which it could not reasonably be expected to foresee. The classical doc-

trine was that when a voluntary unreasonable deviation had occurred, no showing of causation was required since the deviation "displaced" the bill of lading. See The Willdomino, 272 U.S. 718, 725, 47 S.Ct. 261, 71 L.Ed. 491 (1927); The Malcolm Baxter, Jr., *supra*, 277 U.S. at 331, 48 S.Ct. 516; Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto, 282 F. 235 (2 Cir. 1922); [25] The Citta Di Messina, 169 F. 472 (2 Cir. 1909) (dictum); The Indrapura, 171 F. 929, 936 (9 Cir. 1909); The Pelotas, 43 F.2d 571, 579 (E.D.La.1930) (dictum), aff'd, 66 F.2d 75 (5 Cir. 1933); Knauth, *supra*, at 240; Longley, *supra*, § 12.01 [7], at 118–19 ("As the carrier becomes an insurer of the cargo after an unjustifiable deviation, there need be *no causal relationship* between the deviation and subsequent damage to establish the carrier's liability."); Poor, *supra*, § 69, at 203–04. On that view the deviation here would deprive Hellenic of the benefit of Clause 16 and would remit it to the general American rule that freight is not earned until the goods are delivered. While Gilmore & Black have urged with some persuasiveness, in the context of loss or damage to cargo, "that Cogsa has abolished the harsh doctrine which put the carrier in an 'insurer's' position after deviation, and substituted a liability for that damage with which the deviation has some causal connection", Gilmore & Black, *supra*, § 3–41, at 180, that issue remains open. Whatever the ultimate resolution of this point with respect to cargo loss or damage,[26] the appeal of Gil-

---

**24.** While the deviation in *The Louise* was found to be due to the necessity of rectifying an unseaworthy condition caused by gross negligence of the shipowner, the court emphasized that point only in order to show that the deviation was voluntary and thus to distinguish dicta in The Malcolm Baxter, Jr., 277 U.S. 323, 331–32, 48 S.Ct. 516, 72 L.Ed. 901 (1928), concerning deviation required to deal with an unseaworthy condition the non-discovery of which before breaking ground was due to mere negligence. Here the deviation was clearly voluntary.

**25.** In this case the carrier failed to deliver cargo at the port specified and after leaving that port, with the cargo in question still on board, the vessel was sunk by a German submarine. The court noted that the "failure to

deliver the goods at the port named in the bill of lading, and carrying them to another port, is an over carriage, and constitutes a deviation" and said that, upon such deviation, a breach of the contract of carriage, "without any reference to the question of whether the deviation had any bearing on the particular loss complained of, the carrier here must be held for the full damages flowing from the breach." 282 F. at 237. A clause in the bill of lading limiting liability was therefore vitiated.

**26.** In the most recent edition of their work, Gilmore & Black assert that "[t]here may be a trend in recent cases toward the views expressed in this section," Gilmore & Black, *supra*, § 3–41, at 182 n. 124, noting especially a remark in International Drilling Co. v. M/V

more & Black's argument is considerably diminished in a case where the issue concerns a provision such as the "ship and/or cargo lost or not lost" clause which in effect reinstates the "harsh" English rule on prepaid freight that American courts have rejected. Moreover, if lack of causal relation is to be allowed as a defense, whether for cargo loss or damage claims or also with respect to such provisions as the "ship and/or cargo lost or not lost" clause and broad liberties clauses, a point we do not decide, the burden of establishing this should be on the deviator, and Hellenic has not sustained this. According to data submitted by Hellenic, if the Italia had proceeded at normal speed and without stops, she could have reached Aqaba by June 1. A claim of lack of causal relation would thus have to rest on the ground that the damage done to the plates and the loss of fresh water would have prevented the Italia's arrival at Aqaba before June 5 in any event.[27] But there is no proof that these difficulties, apparently caused or aggravated by rough seas encountered when the Italia was one day out of Brooklyn and on many days thereafter, would have occurred if the vessel had taken the more southerly course from the Florida strait to Gibraltar.

We thus think the judge was right in holding that the United States could have recovered the prepaid freight had it

Doriefs, *supra,* 291 F.Supp. at 487, and Judge Hays' statement in dissent in Encyclopaedia Britannica, Inc., v. SS Hong Kong Producer, 422 F.2d 7, 20 (2 Cir. 1969), citing § 3–41: "Indeed, it is generally accepted that COGSA modified the doctrine of deviation in maritime law at least to the extent that insurer's liability attaches only when the damage is causally related to the unreasonable deviation." However, it is conceded that neither statement was in any way essential and there continues to be a surprising dearth of post-COGSA authority.

27. Hellenic also argues that, even if the Italia had not made the North Atlantic port calls, it would "at best have been arguably at the Gulf of Aqaba at the time of the blockade of that Gulf" and would thus have "encountered" the blockade "and obviously dangerous political conditions." It makes reference to news reports appearing on June 1, 1967, with

sought to do so, although on grounds different from those on which he relied.

## IV. *Recovery of Costs at and Onward Transportation from Piraeus.*

As previously recounted, after the inconclusive discussions about Turkey and Hellenic's adamant insistence on discharge at Piraeus, the Government made arrangements for transshipping the flour as close to Aqaba as was feasible in view of the closing of the Suez Canal. Hellenic's basic obligation was to carry the flour to Aqaba or as near thereto as possible. Apart from the liberties clause, the effect of which we shall consider below, it is clear that if Hellenic did not perform its duty, the Government was entitled to take reasonable steps to have this done and to charge Hellenic for the cost. The Oregon, 55 F. 666, 673–74 (6 Cir. 1893) (Taft, C. J.).

Hellenic counters with the liberties clause, see footnote 12, more particularly the provisions that in certain eventualities the carrier is entitled to discharge the cargo at a port other than that named for discharge; that it "may discharge and forward the goods by any means whatever, all at the risk and expense of the goods;" and that "[s]uch discharge shall constitute complete delivery and performance under this contract and the carrier shall be free from any further responsibility."

respect to the blockade at the Strait of Tiran. But the "blockade" of the Strait announced by the United Arab Republic was for the purpose of barring Israeli ships and other ships carrying strategic cargoes from entering the Gulf of Aqaba, see The New York Times, May 23, 1967, page 1, col. 8; relief cargo for Palestinian refugees would presumably have been on a different footing. We also note news reports after the announcement of the blockade with respect to the seemingly free movement of ordinary vessels. See The New York Times, May 25, 1967, page 16, col. 3 (one freighter passed through Strait unmolested and two others were merely "inspected" by United Arab Republic forces); May 28, 1967, page 3, col. 6 (Dutch vessel arrives at Aqaba); June 3, 1967, page 8, col. 4 (British and Greek merchant vessels bound for Aqaba permitted through Suez Canal).

If the Government had suggested on June 9 or 10 that Hellenic delay discharge for a few days in order to determine whether the voyage could proceed, e. g., to Beirut, see note 9 supra, and this proved to be feasible, we would clearly be of the opinion that immediate discharge at Piraeus was not within a fair reading of the liberties clause. Cf. Banco Para el Comercio Exterior de Cuba v. The Ruth Ann, 192 F.Supp. 607, 611–14 (D.P.R.1961), vacated & rem. sub nom. P&E Shipping Corp. v. Banco Para el Comercio Exterior de Cuba, 307 F.2d 415 (1 Cir. 1962), judgment entered sub nom. Banco Para el Comercio Exterior de Cuba v. Steamship Ruth Ann, 228 F.Supp. 501 (D.P.R. aff'd sub nom. P&E Shipping Corp. v. Expresa Cubana Exportadora e Importadora de Alimentos, 335 F.2d 678 (1 Cir. 1964). But after Beirut had once been properly rejected by Hellenic, the Government, perhaps because of its misconception of the date of the Italia's arrival, seems to have proffered no alternative except a port in Turkey. If Hellenic was not justified in rejecting a Turkish port as offering no demonstrably significant advantage over Piraeus, the consequence might be to allow the Government the Piraeus port costs and the somewhat smaller expense of shipment to a Turkish port such as Izmir but not to allow recovery of the higher costs of transportation to Ashdod.

■ We find it unnecessary to pursue this avenue of inquiry, however, because we think that the Government was entitled to prevail on the ground that the liberties clause of the bill of lading, like the "ship and/or cargo lost or not lost" clause, was "ousted" by the voluntary unreasonable deviation to Norfolk and Brooklyn. The analysis in section III of this opinion, including the discussion of causal relation, applies with equal force here.

■ Hellenic is thus thrust back on general principles of maritime contract law. The only defense that comes to mind is that of impossibility of performance. This doctrine includes cases where "performance may be so difficult and expensive that it is described as 'impracticable' ", 6 Corbin, Contracts § 1325, at 338 (1962). See Restatement, Contracts § 454 (1932). However the case might stand if the Government had insisted on transportation to Aqaba via the Cape of Good Hope, see Transatlantic Financing Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312, 316 n. 5 (1966) (dictum) (1956 closure of Suez Canal); but see American Trading and Production Corp. v. Shell Int'l Marine Ltd., 453 F.2d 939, 942 (2 Cir. 1972) (1967 closure) and the leading English cases cited therein,[28] the doctrine of impossibility has no application to the level of added expense here entailed. Moreover, the doctrine applies with respect to "supervening impossibility" only when the promisor is not "in contributing fault", Restatement, Contracts § 457 (1932). As we earlier observed, Hellenic made a considered decision to maximize its profits by stopping to take on additional cargo at Norfolk and Brooklyn, with the certainty of further delay in arrival at Aqaba. When it unexpectedly developed that the stops not only delayed but prevented the agreed delivery, general contract principles do not entitle Hellenic to be excused from its duty of performance simply because this involved substantial added expense.

## V. *Double Recovery.*

■ While the Government was thus entitled to recover the prepaid freight or to require Hellenic to pay the added costs entailed by its doing what Hellenic was bound to do, the district court went wrong in awarding the Government both.

There is no occasion for attempting to add anything to or subtract anything from Professor Corbin's simple statement, 5A Contracts § 1223, at 482–83 (1964):

> Damages and restitution will not be given as concurrent remedies for the

28. There was testimony that no vessels which left port before the 1967 crisis were permitted to recover any surcharge for making the longer trip around the Cape of Good Hope.

same injury. The plaintiff will not be given judgment for his money back and at the same time a judgment for the value of the performance promised him. This is not because there is any necessary inconsistency between the two remedies; it is merely because it is accepted social policy that an injured party should not be given both remedies for a single injury.

See also, *id.* at 485–86. In terms of this case, if Hellenic pays the Government for transporting the flour to a port as satisfactory as Aqaba, the alternative yielding the larger recovery to the Government, there is no moral or legal justification for requiring it to return what the Government had paid it for that very purpose.

VI. *The Government's Cross-Appeal.*

 The only point remaining for consideration is the Government's appeal from the district court's failure to allow the actual cost of shipment from Piraeus to Ashdod on an American-flag vessel rather than the lower cost at which foreign-flag shipment could have been obtained.

The Government relies on the Cargo Preference Acts, 15 U.S.C. § 616a and 46 U.S.C. § 1241(b)(1). The latter provides that when commodities are procured, furnished or financed by the United States, "the appropriate agency . . . shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such . . . shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates." Clearly the statutes would have had no application if Hellenic had carried the flour to Ashdod on the Italia or some other vessel or made its own arrangements for someone else to do so. Hellenic should not be saddled with "extravagant" costs, see *The Oregon, supra,* 55 F. at 674–75, because it forced the Government to make the arrangements, at least unless the Government was required to use an American-flag ship in this particular instance. Clearly it was

not, since the statute demands only that half of the tonnage on which DA ships over time be so transported. Moreover, since the cargo was shipped from the Gulf ports on a foreign-flag vessel, it had surely already been included for planning purposes in that part of DA's tonnage which could be transported in foreign bottoms. Our decision in Cargo & Tankship Management Corp. v. India Supply Mission, 336 F.2d 416 (2 Cir. 1964), cited to us by the Government, is beside the point, for reasons which even a cursory reading will show.

The judgment is reversed insofar as it allows recovery of the prepaid freight and interest thereon and is otherwise affirmed. No costs.