**SWINDELL–DRESSLER INTERNA-
TIONAL COMPANY, Plaintiff,**

v.

**M/V HELLENIC IDEAL and M/V HEL-
LENIC LAUREL, their boilers, etc.,
Hellenic Lines Limited, Transpacific
Carriers Corp. and Universal Cargo Car-
riers, Inc., Defendants.**

**No. 77 Civ. 3812(PNL).**

United States District Court,
S. D. New York.

Oct. 24, 1980.

John E. Cone, Jr., William R. Connor, III, Bingham, Englar, Jones & Houston, New York City, for plaintiff.

John S. Rogers, Burlingham, Underwood & Lord, New York City, for defendants.

## OPINION AND ORDER

LEVAL, District Judge.

This action involves damage to cargo consisting of crane booms, steel rafters and building material shipped from Texas to Saudi Arabia in 1975. Plaintiff, Swindell–Dressler Co., the consignee of the cargo, is an engineering firm which had undertaken to build and operate a factory at Bahra, Saudi Arabia, for the Saudi Red Brick Company, (an enterprise of Sheikh Al–Amoudi). Defendant Hellenic Lines, Inc. is the owner of the Hellenic Laurel and the Hellenic Ideal, aboard which ships the cargo was transported from Houston to the port of Jeddah in Saudi Arabia.

The parties have stipulated, and the proof further showed, that "port conditions, including precautions taken with respect to cargo, were extremely poor" in the port of Jeddah at the time in question. The congestion was strangulating. Ships were required to wait months at the port before having access to a docking area to unload cargo.

Cargo in Jeddah was not delivered directly by carrier (or stevedore) to consignee, but was first delivered into the hands of Saudi customs whose laborers and machinery unloaded the stevedore's trucks and later loaded the consignee's trucks when the consignee came to take delivery. Documentation as to the handling of cargo was comparatively scarce, as was qualified personnel.

The first shipment in question was aboard the Laurel which departed Houston on about August 7, 1975, and arrived in Jeddah on October 5. Discharge of cargo did not occur until December 5 through 22. The cargo was transported by the stevedore into the customs shed where it was unloaded by customs to await the consignee.

On January 1, 1976, the plaintiff, having received notice of delivery, sent employees of Saudi Red Brick to pick up the cargo at customs. Saudi Red Brick transported the cargo from the customs sheds to the construction site at Bahra, some 35 kilometers away. On January 3, 1976, plaintiff noted extensive damage to the cargo and requested a survey. Inspections were made on January 10 and 31 and a report was prepared confirming extensive damage to certain items.

The second shipment departed Houston on board the Ideal on September 8, 1975. The Ideal arrived in Jeddah October 30. Its cargo was discharged beginning January 12, 1976. Employees of Saudi Red Brick again called for the plaintiff's cargo on January 15, 1976, and transported it to the construction site at Bahra. On February 10, 1976, plaintiff requested a survey; inspections were conducted and once again damage was noted to a number of steel members.

Photographs were offered by plaintiff taken at the construction site showing a number of badly mangled pieces of construction steel.

█ Plaintiff sues to recover for the damage to its cargo. I have concluded that the claim fails. Plaintiff has not shown that the goods were in a damaged condition when delivered by the carrier's stevedore into Saudi customs custody. Indeed, plain-

tiff has not even shown that the goods were damaged when delivered by customs into the possession of the plaintiff's agent, Saudi Red Brick. I therefore need not consider what would be the consequences of the intermediate possession of Saudi customs if the cargo were shown to have been in damaged condition when first available to the consignee. Had such damage already existed when delivery was accepted by the consignee's agent at the customs shed, the consignee could have created a record to demonstrate this. It could perhaps have received a confirmatory damage report from customs. If not, it could at least have brought witnesses or surveyors to customs to establish the damage. It was all the more imperative that it do so as to the second shipment after the first was received in bad condition. In both cases the plaintiff sent employees of Saudi Red Brick to pick up its goods at customs. In neither case, however, does the evidence show any perception of damage before the goods were at the job site. In fact in the second case, no record or evidence of the damage exists prior to 26 days after delivery from customs.

In each case the cargo had been handled and transported by the plaintiff's own agents, including at least one loading or unloading, prior to the first notation of damage.

Under the circumstances, I find that plaintiff has failed to establish sufficient likelihood that the damage was not the doing of its own Red Brick crews after their receipt of the goods from customs. *See McMillan v. Marine Sulphur Shipping Corp.,* 607 F.2d 1034 (2 Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *Dreijer v. Girod Motor Co., Inc.,* 294 F.2d 549 (5 Cir. 1961). Plaintiff has therefore failed to make out its prima facie case. *See Demsey & Assoc. v. S.S. Sea Star,* 461 F.2d 1009 (2 Cir. 1972).

Plaintiff argues that its burden should be eased by two instances of unreasonable deviation. First, both vessels called at an unscheduled port in Heraklion, on the Island of Crete, to change crews. In one case a log note shows the debarkation of a person who may have been a passenger. Secondly, on the Laurel, it appears that certain large steel pieces were transported on deck, in deviation from the imputed term of the clean bill of lading which requires carriage in the hold of the ship. *See DuPont de Nemours International S.A. v. S.S. Mormacvega,* 493 F.2d 97 (2 Cir. 1974); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7 (2 Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

Assuming without deciding that the issue of deviation is pertinent in light of plaintiff's failure to show that the damage occurred prior to its receipt of the goods, I find that no unreasonable deviations occurred. The detour to Heraklion and brief stop there added only 29 miles to the voyage, delayed the ship an insignificant amount of time, and was in each instance primarily for the purpose of switching crews. *See American Metal Co. v. M/V Belleville,* 284 F.Supp. 1002 (S.D.N.Y.1968). It had no causal relationship with the damage. Nor was the storage above deck improper. Defendant showed that the risk of handling damage to huge construction members is reduced rather than increased by storage above decks because this eliminates the need for the difficult operation of lowering oversize bulky and heavy objects through the hatches into the holds, and the converse on discharge. There was no showing that exposure to the elements was a factor to be considered in the storage of this cargo, or that such exposure contributed to the damage. *See DuPont de Nemours International S.A. v. S.S. Mormacvega, supra.* It has not been shown that the damaged members were those carried above decks.*

* I note that even if these deviations were deemed unreasonable, it is not clear that such deviation would result in the carrier's liability for unrelated damage. It is clear that the dam-

age to plaintiffs goods was the result of very rough mishandling and totally unrelated to either of the alleged deviations. The classical doctrine was that unreasonable deviation re-

The last remaining issue concerns Hellenic's obstruction of plaintiff's attempts to conduct discovery. This was discussed in a recorded conference on December 1, 1978, during which I noted a "persistent and undoubtedly intentional refusal on defendant's part to comply with discovery orders."

At that time I ordered that Hellenic produce within 60 days the long delinquent logs of the vessels for the voyages in question, translated into English. I warned that a failure to comply would result in sanctions including an order under Rule 37(b)(2)(A) deeming the unproduced rough log books to contain proof confirming plaintiff's theory. I invited plaintiff to submit an order providing for such relief upon the expiration of 60 days if Hellenic failed to comply.

Hellenic had produced the "smooth" log books, being the official document recognized under Greek law, but had failed over a long period of time to comply with plaintiff's demands and my order to produce the "rough" (unedited contemporary) logs.

According to defendant's post–trial papers it produced the rough log for the Ideal pertaining to the latter half of its voyage on January 5, 1979, in untranslated form. Hellenic claimed it was unable to find the rough log of the Laurel or for the first half of the Ideal's voyage. On February 1, 1980, Hellenic finally produced the Laurel's rough log, offering to give certified translation of portions of interest but asking to be excused from translating the remainder in view of the great expense which would be involved. Plaintiff's counsel did not take up defendant on this proposal.

Trial was held on April 14–17, 1980.

 On all the circumstances, I have decided not to invoke the sanction of inferring that the logs not timely produced would have proved plaintiff's case.

On the other hand, it seems clear to me that sanctions should be imposed under Rule 37 for an obdurate, long continued endeavor to impede plaintiff's discovery, delay the progress of the action and obstruct justice by failing to comply with proper discovery demands, even after court orders directing compliance. A particularly egregious example involved the production of the Saudi laws. At repeated status conferences during 1978, Hellenic contended that it intended to rely "on Saudi law" as a defense to the claimed liability. Plaintiff repeatedly demanded identification and production of the portions of Saudi law on which defendant relied; I vainly instructed Hellenic to furnish this to plaintiff. It was not until my orders were recast in October 1978 in the form of threats that Hellenic found those instructions worth bothering with and finally complied.

Hellenic's obstruction delayed the progress of the case and subjected plaintiff's counsel to great inconvenience and expense including several otherwise unnecessary trips to court, the writing of letters, and the making of motions with affidavits reviewing the lengthy history of non–compliance.

Accordingly I direct that Hellenic shall pay to the plaintiff reasonable expenses including attorneys' fees in the amount of $5,000.

The complaint is dismissed, judgment to be entered in favor of the defendant, without costs, sanctions to be awarded to plaintiff as specified above. Submit judgment on notice.

So Ordered.

sulted in insurer's liability for the carrier. *Hellenic Lines v. United States*, 512 F.2d 1196 (2 Cir. 1975). However recent authorities have suggested "that COGSA has abolished the harsh doctrine that put the carrier in an 'insurer's' position and substituted a liability for that damage with which the deviation has some causal connection." Gilmore & Black, *Admiralty*, § 3–41 at 180 (2d ed. 1975); *Accord,*

*Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, supra*, 422 F.2d at 20 (Hays, J., dissenting). *See Singapore Navigation Co., S.A. v. Mego Corp.*, 540 F.2d 39 (2 Cir. 1976) (Oakes, J., dissenting). *But See* 2A Benedict, *Admiralty*, § 128 at 12–30–12–32 (7th ed. 1977). This question is apparently still an open one in this Circuit as it was when discussed in *Hellenic Lines, supra*, 512 F.2d at 1209–1210.