NATIONAL STARCH & CHEMICAL COMPANY & Atlantic Mutual Companies, As subrogee of the claim of National Starch & Chemical Company, Plaintiffs–Appellees,

v.

PROJECT ASIA LINE, INC., Defendant,

M/V MONCHEGORSK, Her engines, boilers, etc., and Murmansk Shipping Co., Defendants–Appellants.

No. 00–9500.

United States Court of Appeals, Second Circuit.

June 27, 2001.

Christopher H. Mansuy, De Orchis, Walker & Corsa, LLP, New York, NY, for appellant.

Robert J. Phillips, Bigham Englar Jones & Houston, New York, NY, Scott Scherban, on the brief.

Present JACOBS, PARKER and SOTOMAYOR, Circuit Judges.

*SUMMARY ORDER*

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the United States District Court for the Southern District of New York be, and it hereby is, AFFIRMED.

Plaintiffs-appellees National Starch & Chemical Co. ("National Starch") and Atlantic Mutual Cos. sued defendants-appellants M/V MONCHEGORSK, *in rem*, Murmansk Shipping Co., *in personam*, and Project Asia Line, Inc. ("PAL"), *in personam*, seeking money damages of $819,039.17 caused by damage to a shipment of tapioca starch carried by sea from Srirachi–Siam Seaport Terminal, Thailand to Portland, Maine. Following a bench trial, the United States District Court for the Southern District of New York (Duffy, J.) entered judgment for National Starch for $939,347.73 (inclusive of pre-judgment interest). We affirm.

I.

We assume familiarity with the district court's lucid findings of fact. Briefly: In March 1995, National Starch entered into a charter agreement with PAL providing that PAL would carry a cargo of 6,800 metric tons of bagged tapioca aboard the M/V Monchegorsk from Sriracha–Siam Seaport Terminal, Thailand to Portland, Maine. While loading assorted grades of tapioca in the early morning of July 22, 1995, two of the grades became soaked with water because the ship's crew was unable to close its hatches in time to prevent a tropical downpour from pooling on top of some of the bags and seeping into the cargo. Later that day, several samples were tested, revealing unacceptable moisture content (an indication that microbiological growth may be afoot). National Starch's Thai representatives suggested off-loading the materials for a full inspec-

tion, but the ship's captain refused, and the vessel left the load pier for the Portland safe berth.

En route, the ship stopped at Masinloc in the Philippines to load a shipment of bulk chrome ore. To accommodate the new cargo, the tapioca starch was shifted to different holds, a procedure that revealed significant water damage to the cargo as well as to the ship's dunnage. The Bill of Lading identified the port of discharge as Portland, but the destination was changed (at some point en route) to Montreal, where the chrome ore was discharged. The Montreal detour entailed an extra 1500 miles (approximately nine days of travel time) before docking at Portland.

Upon ship's arrival at Portland, National Starch detected some high levels of mold in the cargo, and determined none of the tapioca starch could be sold to its customers because it could not guarantee that any of the cargo met standards for microbiological content. National Starch sold the product at a deep discount (to a foreign company for animal consumption) and sued for the difference between its mitigated costs and the cargo's fair market value.

II.

Following a two-day trial, the district court issued Findings of Fact and Conclusions of Law placing the blame for the incident squarely on defendants. Rejecting the new trial motion, the court later supplemented its findings and legal conclusions in a memorandum and order.

Appellants challenge: (i) the finding that the tapioca starch was in good condition at the time of delivery to the vessel in Thailand; (ii) the conclusion that the vessel's discharge at Montreal was an unreasonable geographic deviation (thereby depriving it of the per-package limitation of liability afforded by the Carriage of Goods at

Sea Act ("COGSA"), 46 U.S.C.App. § 1304(6)), and the related finding that the unreasonable geographic deviation caused additional damage to the cargo; and (iii) the award of damages for the fair market value of the cargo without requiring National Starch to prove damages bag by bag. We affirm.

### 1. *Pre–Shipment Condition*

■ As evidence of good pre-shipment condition, National Starch submitted a clean Bill of Lading and testimony from its quality control superintendent (confirmed by ten pages of supporting documentation) that the cargo's moisture content was not abnormal prior to the rainstorm. We have reviewed the record, and see ample factual support for the district court's finding of good pre-shipment condition. There was no clear error.

### 2. *Unreasonable Geographic Deviation/Damage Resulting From the Deviation*

■ COGSA limits a carrier's liability to $500 per package, but only if there is no unreasonable deviation. *See* COGSA § 1304(5). More particularly, COGSA § 1304(4) provides in part:

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage ... *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

*Id.*

Defendants concede that the deviation to Montreal would be "unreasonable" under COGSA, but for a clause in the charter party stating "[t]he vessel has the liberty to sail at any port or ports in any order, for any purpose ... and also to deviate for the purpose of saving life and/or property." According to defendants, this clause confers complete discretion or power to stop "in any order for any purpose," and therefore contractually alters the COGSA presumption of unreasonableness. In rejecting this construction, the district court reasoned that the first quoted part of the clause means simply that the vessel could stop at any port along its route *without deviating,* and that, under the second clause, only deviations for the purpose of saving life and/or property are reasonable.

The district court's reading of the clause is not inevitable, because the second part of the clause could reference deviations to ships and persons in distress at sea, in which case the deviation here might be reasonable under the circumstances. But we need not definitively resolve this issue to decide this appeal.

Monchegorsk's Bill of Lading states that "[COGSA] shall govern before loading and after discharge and throughout the entire time the goods are in the Carrier's custody." Similar wording appeared in the bill of lading construed in *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80 (2d Cir.1983). The analysis in *Nancy Lykes,* which turns on the bill of lading, controls:

It follows that a deviation which unjustifiably exposes cargo to unanticipated risks is such a serious breach of the contract of carriage that the carrier must be deprived of the protection of the § 4(5) liability limitation ... Indeed, exposing carriers which engage in unreasonable deviations to the risk of full liability has the salutary effect of discouraging such deviations. On the other hand, to allow carriers to limit their liability when an unreasonable deviation causes damage to cargo not only would weaken the carrier's primary duty of

care to cargo under § 3(2) of COGSA ..., but would render meaningless the § 4(4) distinction between reasonable and unreasonable deviations....

*Id.* at 87. Defendants made no showing that the deviation was reasonable *under COGSA,* as *General Electric* requires. So regardless of whether PAL's conduct was or was not a breach of the charter party, it cannot take advantage of COGSA's $500 per package limitation on liability.

 Relatedly, defendants argue that they are entitled to the $500 limitation of liability because the district court's finding that the extra mileage and time entailed by the Montreal deviation significantly enhanced the damage was clearly erroneous. We disagree. The court found that "any delay in time will cause increased bacterial growth, and more damage to the product." That finding is based in part on the testimony of several National Starch employees. We see no reason, and none is offered, to overturn this finding.

### 3. *Damage Assessment*

 We reject PAL's argument that the district court improperly relieved National Starch of the burden of proving damages after discharge. As the district court observed, a bag by bag survey (costing approximately $200,000) of the entire cargo (worth approximately $700,000 in good condition) would have been financially impracticable. Conceivably, such an accounting could have been performed at less expense to National Starch before the Monchegorsk left port at Thailand, but the court found that the "Ship's captain chose not to do it," and "[n]o satisfactory explanation was given for not doing it." In any event, causation is presumed if (as the district court found and held) the deviation was unreasoable. *See Hellenic Lines, Ltd.*

*v. United States,* 512 F.2d 1196, 1209 (2d Cir.1975).