**GENERAL ELECTRIC COMPANY, International Sales Division, Plaintiff,**

v.

**SS "NANCY LYKES", her engines, boilers, etc., and Lykes Bros. Steamship Co., Inc., Defendants.**

No. 80 Civ. 3348 (MEL).

United States District Court,
S. D. New York.

April 15, 1982.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; John E. Cone, Jr., Helen M. Benzie, New York City, of counsel.

Costello & Shea, New York City, for defendant; Daniel J. Keenaghan, New York City, of counsel.

LASKER, District Judge.

General Electric Company International Sales Division ("GE") sues to recover for two locomotive cabs which were shipped by Lykes Bros. Steamship Company ("Lykes") via its liner service aboard the vessel the S.S. Nancy Lykes from New Orleans, Louisiana, destination Keelung, Taiwan. The locomotives were lost at sea on May 5, 1978, when the vessel encountered gale winds and rough seas off the coast of California.

The relevant voyage of the Nancy Lykes commenced in Mobile, Alabama on April 10, 1978, and proceeded to New Orleans, its first port of call. The advertised itinerary for the vessel listed Yokohama, Japan ("Kobe") as the next port of call, with an estimated arrival date of May 11, 1978. Instead of proceeding directly to Kobe after passing through the Panama Canal, however, the vessel next went to San Pedro, California, to secure fuel (bunkers). San Pedro was not listed on the published itinerary of the voyage. Lykes candidly acknowledges that the stop was made to take advantage of the low fuel prices then available at San Pedro and that its operations department directed the master to make the stop while the vessel was still in the Gulf area.

## I.

GE contends that the bunkers call at San Pedro constituted an unreasonable deviation from the published itinerary of the vessel and that the deviation caused the vessel to encounter the gales which precipitated the loss of the locomotives. In addition, GE alleges that the locomotives, which were stowed on deck, were not properly secured.

GE's weather routing expert, Robert Raguso,[1] testified that by proceeding to San Pedro rather than along the ordinary direct route to Kobe the Nancy Lykes ran a substantially higher risk of encountering unfavorable weather. According to Raguso, the first weather risk would be confronted as the vessel moved from the Panama Canal up the coast of California toward San Pedro. Such a route necessitated passing through the Gulf of Tehuantepec where, Raguso testified, there are many local gales or high winds during the winter and spring months. (Tr. at 60–62). In addition, Raguso testified that the stop at San Pedro also entailed confronting a second weather risk off the coast of California after leaving San Pedro. According to Raguso, mariners and meteorologists are generally familiar with winds which are indigenous to the California coast, some of which are known as Santa Anna winds, some Chinook winds, and others Boras winds. These winds regularly occur off the coast of California during the winter and spring months, and it is these winds which Raguso believes the Nancy Lykes faced on May 5th. He testified that it was evident from May 1, 1978, that northerly winds were dominating the California coast in a corridor between 43 degrees north latitude down to 32 or 30 degrees north latitude in the coastal region. (Tr. at 79). Utilizing weather reports from vessels published in the Mariner's Weather Log for the past ten years, Raguso estimated that there is a five to six percent probability of gales occurring off the California coast during the month of May. (Tr. at 84–85). According to Raguso, he treats a probability of unfavorable weather of above one-half of one percent as a potential adverse condition to take into consideration in routing a vessel. (Tr. at 136).

Raguso testified that the usual trade route from the Panama Canal to Japan would be within the area between 33 degrees north latitude and 16 or 17 degrees north latitude at 150 degrees northwest longitude on the southern side and that, had the Nancy Lykes stayed within this usual route area on the particular voyage, it would not have encountered the gale winds which ultimately caused it to lose the locomotives. (Tr. 94–95–96). Moreover, it was Raguso's opinion that, in view of the fact that the vessel was carrying such heavy cargo on deck, he would have considered safety to be the paramount factor in routing the vessel and he testified that he would have recommended the southernmost route within the customary area in view of the fact that favorable conditions generally exist on the southern tack. Raguso researched this route for the time when the voyage actually occurred and found that favorable conditions would have in fact obtained had the vessel proceeded along that route.

Raguso also researched the weather encountered by two other Lykes vessels which had made bunkers stops in San Pedro on the way to the Far East from the Panama Canal. He found that the Dolly Thurman had encountered heavy winds in the Gulf of Tehuantepec in late March, 1978, as it made its way toward San Pedro, and that the Brinton Lykes had encountered unfavorable conditions in April, 1978, soon after leaving San Pedro. (Tr. at 88–93). In Raguso's opinion, had these vessels taken a more direct and ordinary route from the Panama Canal to the Far East, they would not have encountered such unfavorable weather. (Tr. at 93–94).

GE's next witness, Charles Kohler, Jr., a bunkers broker for approximately thirty years, testified that bunkers were readily available in the Gulf ports of the United States as well as in the ports of Balboa and Cristobal, Panama, in April and May of 1978. Kohler also testified that in his years as a bunkers broker he had never been

---

1. Raguso is currently employed and has been for fourteen years by the Bendix Field Engineering Corporation as manager of the Marine Science Service Department, where he directs a staff of meteorologists, oceanographers and licensed ships' officers and communication technicians. He is involved in ship routing, voyage performance surveys and other marine and meteorological activity. Prior to his present position, he was employed in other firms doing similar work.

asked by a liner service operator to acquire bunkers at a port that was not a regularly scheduled port of call for the particular line. Kohler believed that the reason that liner operators do not seek bunkers at ports other than ports of call is that they ordinarily are emphatic that the vessel not be delayed and a diversion for bunkers would normally delay the vessel. (Tr. at 145–46). Kohler further stated that it is not the custom for berth line operators not to advertise their bunkering stops since they take on bunkers at their ports of call. (Tr. at 148).

Captain Richard Patterson, a former master with United States Lines with over fifty years of maritime experience, testified that in his opinion the locomotives aboard the Nancy Lykes were not properly secured because only five or six chains of five ton capacity each were tied around the locomotive creating only a thirty ton restraining capacity while the locomotives weighed fifty-two to fifty-three tons each. He expressed the opinion that the locomotives should have been secured with more chains and that the chains should have been crossed to create a diagonal or horizontal restraint. (Tr. at 168). Patterson also testified that, in view of the on deck cargo being carried, he would have protested directions to take a more northerly route to Kobe if he had been the vessel's master. He stated that the time saved by alternative routes would have made up for any savings in bunkers costs gained by bunkering at San Pedro. Patterson stated, finally, that on two voyages out of six he had made along the coast of California in the spring, he encountered Santa Anna winds.

The remaining GE witness, Dale Werner, manager of cost estimating and analysis for GE, testified that the two identical replacement locomotives provided to make up for the lost locomotives cost $1,638,000 to produce and $71,000 to ship.

## II.

Lykes contends that it is customary for liner services to stop for bunkers in ports that are not advertised in their published itineraries; that Lykes established a custom beginning in 1978 of using San Pedro as a bunkers only port; that the bill of lading liberty clause encompassed such a step; that the locomotives were properly secured on the deck of the Nancy Lykes; and that the diversion to San Pedro did not involve a substantial risk of encountering unfavorable weather.

Ralph Lacher, assistant manager of Lykes' operating division, testified that on a few occasions in his past experience on liner service vessels he had stopped for bunkers at ports not advertised as ports of call. According to Lacher the decision to use San Pedro as a bunkering stop for Lykes' liner service vessels going from the Gulf to the Far East was made in early 1978 because at that time it became clear that San Pedro had the lowest cost bunkers. The first such vessel to stop there was the Dolly Turman in March, 1978, followed by the Brinton Lykes in late March and the Nancy Lykes in early May. Ten additional Lykes vessels made the stop after the Nancy Lykes in 1978, 21 in 1979, and 50 in 1980. Approximately $25,000 in fuel costs were saved by the Nancy Lykes by bunkering at San Pedro. (Tr. at 216–30).

William Kaciak,[2] Lykes' weather routing expert and the actual weather router utilized for the voyage of the Nancy Lykes at issue, disagreed with Raguso's testimony in critical respects. First, he testified that gales in Gulf of Tehuantepec are infrequent and, in any event, are forecastable two days in advance. Relying on data from the Climatological and Oceanographic Atlas, compiled by the United States Weather Service and the United States Hydrographic Office, Kaciak estimated the frequency of force 7, or near gale, winds in the area at about 4 percent in March (the month of the Dolly Thurman voyage), and the frequency of force 8, or gale, winds in March at about 1 percent. In April, he estimated the proba-

---

2. Kaciak owns and operates Weather Routing, Inc., which routes for shipping companies. The company was a pioneer in the weather routing service. In addition, Weather Routing, Inc., employed Raguso from approximately 1961–1965.

bility at two percent for force 7 winds and zero percent for force 8 or greater. He estimated that in May the probability was one percent for force 7 winds and zero percent for force 8. (Tr. at 273–76).

Second, Kaciak disagreed that the Nancy Lykes encountered Santa Anna, Chinook or Bora winds and expressed the view that the vessel had encountered "jet effect" winds. (Tr. at 278–80). He estimated the frequency of gale force winds off the coast of California at less than one percent for the months of April and May. (Tr. at 284–85).

Kaciak disagreed with Raguso that a one half of one percent probability of adverse weather was sufficient to warrant consideration of a different route, stating that even in the calmest regions the odds of encountering unfavorable conditions are likely to be that high.

Finally, Kaciak differed from Raguso that a reliable estimate of the probability of weather events could be gleaned from the Mariner's Log because, he stated, the publication's data depends on ships' reports and is necessarily incomplete. He asserted that his estimates for the probabilities of weather events rested on publications containing more complete data going farther back in time.

Kaciak testified that the particular route chosen for the Nancy Lykes from San Pedro was a relatively northern route because, in light of the cargo on deck, it was imperative that the vessel head into any wind so that rolling could be avoided. He conceded that his company miscalculated the movement of the winds and had expected them to move south more quickly. However, Kaciak disagreed with Raguso's theory that a vessel should be routed according to statistical weather patterns. He stated that the preferable method of routing is to consider the particular conditions existing at the particular time the routing decision is made. Kaciak testified that he would not have routed the Nancy Lykes from the Panama Canal along a southern route, as Raguso recommended, because at the time storms were predicted in the area. To avoid the northerlies he would have chosen

the northern portion of the region described by Raguso as the ordinary area for voyages to the Far East for the first part of the voyage, and would then have routed the ship in a northerly direction. (Tr. at 304).

Lykes' final witness, Captain Robert Wall, a transportation consultant and former commander of a liner service vessel for Farrell Lines, testified to instances where liner service vessels he mastered or managed stopped for bunkers at ports that were not advertised ports of call, and asserted that it was customary for liner services to do so. He testified that it would be confusing for a liner service to advertise as a port of call a port which was to be used for bunkers only since cargo shippers would mistakenly expect the port to be available for cargo pick-up or delivery. Finally, Wall stated that the National Cargo Bureau Certificate of Inspection which was issued to the Nancy Lykes after the locomotives were loaded was generally relied on to confirm proper stowage within the maritime industry.

### III.

■ GE has failed to establish that the locomotives were not properly secured on the deck of the Nancy Lykes. The only evidence presented on this point was Patterson's opinion that more chains should have secured the locomotives. This conclusion, however, is contradicted by the National Cargo Bureau Certificate of Inspection which followed an actual inspection of the locomotives on deck. It is undisputed that this Certificate is generally relied on in the maritime industry to establish proper stowage.

■ GE has established, however, that the decision to proceed to San Pedro for bunkers was unreasonable. It is undisputed that sufficient bunkers were available in the Gulf ports and in the Panama Canal ports to carry the vessel to Kobe. It is also clear that the ordinary and customary trade route from the Panama Canal to the Far East is within the area described by Raguso. This conclusion is confirmed by the

testimony of Kaciak that, if he had been asked to route the vessel from the Panama Canal to Kobe, rather than from San Pedro to Kobe, he would have recommended a course on the northern portion of the area described by Raguso, at least for the first part of the voyage. Moreover, the evidence established that vessels on liner service ordinarily take bunkers at an advertised port of call. Most importantly, we are persuaded that the diversion to San Pedro created an increased risk that unfavorable weather would be encountered. Raguso and Kaciak agreed at least that the statistical probability of encountering gale or near gale winds, of whatever variety or designation, increases in the springtime in the region the more northerly one goes from a latitude of approximately 30 degrees. By leaving from San Pedro rather than the Panama Canal, the vessel was assured of passing through the region north of 30 degrees whatever routing was chosen from San Pedro. Furthermore, we accept Raguso's estimate that the statistical probability of gale winds during this time of year is approximately 5 or 6 percent off the coast of California since, in addition to the expert testimony of the weather routers, every mariner with experience on these seas who testified acknowledged that gale or near gale northerly winds are known among mariners to occur in the region in the winter and spring months. Accordingly, we find that whatever the precise percentage of increased probability of unfavorable weather, the decision to go to San Pedro created a significantly greater risk of encountering unfavorable weather. Indeed, the two prior Lykes' vessels which made the San Pedro stop prior to the Nancy Lykes both encountered such weather, one from Gulf of Tehuantepec winds, the other from winds off the coast after departing from San Pedro. At the least, this prior experience should have forewarned Lykes of the potential dangers in diverting to San Pedro.

Moreover, while it has not been demonstrated that the locomotives were improperly stowed on deck, the fact that such weighty cargo was being carried on deck should have been a significant consideration militating in favor of a route on the calmest seas possible. By directing the vessel to take on bunkers at San Pedro, Lykes foreclosed safer options and thrust the vessel into areas where the probability was increased that unfavorable weather would be encountered. This added risk of damage or loss to cargo solely for the benefit of the vessel must be deemed unreasonable. Indeed, there is no evidence that Lykes considered any factor other than its fuel cost savings in directing its vessels to take on bunkers at San Pedro.

Lykes' contention that the stop at San Pedro was not a deviation in light of the broad liberty clause contained in the bill of lading is unpersuasive. Paragraph III of the applicable bill of lading defines the permissible scope of the voyage as including "usual, customary or advertised ports, whether herein named or not, and ports in or out of the advertised, geographic or usual route or order ..." In reference to a similarly broad liberties clause it has been noted that "[i]t would seem hard to 'deviate' from such a voyage." Gilmore & Black, The Law of Admiralty, 178 (2d Ed. 1975). Such a construction would undercut the policy and statutory provisions forbidding a carrier from contracting out of liability for his own wrongdoing and would be inconsistent with § 3(2) of the Carriage of Goods by Sea Act ("COGSA") which imposes upon the carrier a duty to "... properly ... carry the goods." Id. at 178. Furthermore, § 4(4) of COGSA implies as clearly as possible that any unreasonable deviation is to be treated as a breach of the Act and the contract of carriage:

"Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this Act or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers as it shall, prima facie, be regarded as unreasonable.*" [Emphasis supplied]

Indeed, § 4(4) confirms that a carrier may not define the voyage in such broad language as to render it impossible for any deviation to be found no matter how far the vessel wanders from the specified route. Lykes' proposed construction of the liberty clause is at odds with § 4(4)'s concept of reasonable and unreasonable deviations. The liberty clause must therefore be construed to permit only reasonable deviations from the anticipated journey. *Id.* at 179. Moreover, the reasonableness of the deviation may not be judged merely from the point of view of the carrier. As § 4(4)'s proviso suggests, the carrier may not justify a deviation merely because it was to his benefit. "The carrier, throughout the performance of the voyage, is always subject to the Section 3(2) duty to care for and carry the goods properly, and his decision on a route would seem to be improper and unreasonable whenever it is made in disregard of that duty." *Id; see Spartus Corp. v. S.S. Yafo,* 590 F.2d 1310 (5th Cir. 1979); *Encyclopedia Britannica Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970).

Nor are we persuaded that Lykes' prior stops at San Pedro rendered that practice "customary" so that the Nancy Lykes' stop was not a deviation or was a justified deviation. The evidence established that, at least for liner services, bunkers are ordinarily secured at one of the ports of call advertised in the Journal of Commerce. Indeed, Kohler, in his long experience as a bunkers broker, had never been asked by a liner operator to secure bunkers in a port that was not an advertised port of call. Despite GE's evidence of instances where such stops were made, it is clear that, at the least, such stops are extraordinary for liner service vessels.

Similarly, Lykes' contention that the stop at San Pedro was a customary one for vessels going to the Far East is without merit. Lykes relies on the facts that, prior to the Nancy Lykes, it had directed two other vessels to stop at San Pedro for bunkers and that it used San Pedro frequently in the years following, as did other lines.

However, the critical element as to "custom" in the cases relied on by Lykes is the knowledge on the part of the *shipper* that a particular port was a customary port for the voyage. *See, e.g., W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha,* 12 F.2d 519 (9th Cir. 1926); *The Frederick Luckenbach,* 15 F.2d 241 (S.D.N.Y.1926); *The San Guiseppe,* 122 F.2d 579 (4th Cir. 1941). Of course, where the shipper has knowledge that a particular stop will be made and consents either explicitly or implicitly, as in the cited cases, the particular stop can hardly be labeled a deviation from the contemplated voyage. In such circumstances, the shipper is logically held to have consented to any greater risks to his cargo imposed by the additional stop. By contrast, in the present case there were only two such diversions before the voyage in question; regardless of the later practice of Lykes or other liner services, knowledge on the part of GE that Lykes would be bunkering at San Pedro cannot be inferred, and all the evidence indicates that GE did not in fact know that such a stop was planned. In these circumstances, GE cannot be held to have consented to whatever added risks that were occasioned by the San Pedro deviation. In addition, in light of the finding that liner services ordinarily only bunker at advertised ports of call and that the ordinary trade route to the Far East from the Panama Canal is significantly further south than San Pedro, it cannot be said, as in *The San Guiseppe, supra,* that the bunkering stop was merely ancillary to the contemplated voyage.

In sum, the stop of the Nancy Lykes at San Pedro for bunkers was a deviation from the ordinary route for a liner service vessel since San Pedro was not an advertised port of call and was not along the ordinary trade route from the Panama Canal to the Far East. In light of the fact that the deviation exposed the vessel to significantly greater risks of adverse weather, and was made solely for the benefit of the vessel, it was unreasonable. As an unreasonable deviation, the vessel is liable for any damage to cargo caused by the

diversion and recovery is not limited to the $500 per package limitation contained in the Bill of Lading and in COGSA.

Accordingly, GE is entitled to recover the $1,709,000 it cost it to replace the locomotive cabs lost overboard.

Submit judgment.