**BERKSHIRE FASHIONS, INC.,**
**Plaintiff–Appellant,**

v.

**The M.V. HAKUSAN II, her engines boilers etc. in rem Canopus Ship–Holding S.A., Nippon Yusen Kaisha, Showa Kaiun, Air–Sea Transport Inc., Orient Star Shipping (USA) Inc., Y.F.K. Cargo Service, Inc. a/k/a Y.F.K. Air Cargo Service Inc., Global Traffic Systems Inc., and J.O.V. Enterprises, Inc., Defendants–Appellees.**

**GLOBAL TRAFFIC SYSTEMS and Jo–Lin Hauling, Inc., Third–Party Plaintiffs–Appellees,**

v.

**CARBRO CONSTRUCTION CORP., and the City of Linden, N.J., Third–Party Defendants–Appellees.**

**No. 90–5891.**

United States Court of Appeals,
Third Circuit.

Argued March 5, 1991.

Decided Jan. 23, 1992.

Harry Robinson, III (argued), John Bowens, Gennet and Kallmann, Roseland, N.J., for third-party plaintiff-appellee, Global Traffic Systems.

George W. Wright (argued), Kroll and Tract, Newark, N.J., for plaintiff-appellant Berkshire Fashions.

Before BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal primarily involves questions about the breadth of the federal courts' admiralty jurisdiction. It arises out of a dispute about the loss of a shipment of umbrellas in transport between a Taiwanese manufacturer and an American retailer. The retailer, New York-based plaintiff Berkshire Fashions, Inc. ("Berkshire"), purchased seven hundred and fifty cartons of umbrellas from defendant Jiung Chia Umbrella Enterprises, Inc. ("Jiung Chia"), a Taiwanese manufacturer. Pursuant to the purchase agreement, Jiung Chia obtained a Bill of Lading ("the Bill") from a shipping agent, defendant Air–Sea Transport, Inc. ("ASTI"), to ship the cartons from Taiwan to New York. As is apparently often the case with such agency agreements, the Bill did not specify whether the goods would be transported from Taiwan to New York by both rail and sea or by sea alone, and from that contractual ambiguity this dispute about admiralty jurisdiction arises.

Acting as the agent for Jiung Chia and Berkshire, ASTI apparently contracted with a number of transport and storage companies to ship the goods from Keelung, Taiwan to New York. The parties dispute what happened after ASTI made those arrangements. Defendant Global Traffic Systems, Inc. ("Global") contends that the goods were shipped from Taiwan to Los Angeles and then transported by rail from Los Angeles to New Jersey, where they were stolen from a storage facility. Berkshire contends that the cartons were never shipped from Taiwan, but, whether they were or were not, insists that the Bill implicitly contemplated that the umbrellas would travel by sea alone. The cartons were missing when Berkshire's agents arrived at the New Jersey storage facility of Global to accept delivery.

Alleging theories of breach of contract and tort, Berkshire filed suit in the District Court for the District of New Jersey and named as defendants all of the parties allegedly involved in transporting the goods from Taiwan to New Jersey. As a basis for federal subject matter jurisdiction, Berkshire initially asserted admiralty jurisdiction because, it claimed, the contract that it entered into for transport of the umbrellas was a wholly maritime contract, one that was supposed to involve transport by sea alone. The district court rejected that argument and granted defendant Global's motion to dismiss for lack of subject matter jurisdiction.[1] The court found that the claim did not give rise to admiralty jurisdiction because, in its view, the contract called for extensive cross-land transport.

After the district court granted Global's motion to dismiss, Berkshire sought to amend its original complaint to drop a non-diverse defendant from the suit and to assert diversity of citizenship as an alternate ground for subject matter jurisdiction. The district court denied the motion to amend because, among other reasons, it believed that dropping the non-diverse party would not allow for diversity jurisdiction as the amount in controversy was less than $50,000.00. Berkshire now appeals both orders.

The critical consideration on appeal is the travel route required by the Bill of Lading, and, more precisely, whether the district court correctly construed this admittedly

---

1. Defendant-appellee Global alone moved to dismiss the suit for lack of subject matter jurisdiction and, hence, is the only appellee in the case.

ambiguous contract of carriage as a contract for both land and sea transport of the goods or whether the Bill should instead be viewed as requiring sea carriage only. If the former interpretation prevails, then admiralty jurisdiction does not arise; if, however, the latter construction is correct, then admiralty jurisdiction is appropriate regardless of the route actually taken.

For the reasons that follow, we conclude that the district court erred in dismissing the complaint. We reject defendant's contention, accepted by the district court, that the so-called "liberties" clause, which allowed the carrier to use any means of transport it saw fit, defeated admiralty jurisdiction. Because we find an ambiguity in the Bill of Lading that should be clarified by additional evidence and resolved by findings of fact, we will reverse the district court's order dismissing the complaint and remand for further proceedings to determine the contract's meaning.

With respect to the district court's order denying the motion to amend to assert diversity jurisdiction, we find that the district court erred in determining that an amendment was not permissible because the amendment stated a *new* basis for jurisdiction. The district court also erred in failing to acknowledge that the amendment related back to the original filing of the complaint, at which time the required jurisdictional amount was plainly met. Hence, we will also reverse the district court's denial of the motion for reconsideration and remand so that plaintiff might have leave to amend its complaint in the event that admiralty jurisdiction does not attach.

## I. FACTS AND PROCEDURAL HISTORY

In May 1988, plaintiff Berkshire, a New York corporation that sells women's accessories, purchased under a bank letter of credit seven hundred and fifty cartons of umbrellas from Jiung Chia. At Berkshire's request, Jiung Chia arranged to transport the umbrellas from Taiwan to New York. As part of this arrangement, Jiung Chia obtained a Bill of Lading from defendant ASTI, a freight forwarder engaged in the business of arranging such shipments. At some point during or after May 1988, Jiung Chia provided a copy of this Bill of Lading to Berkshire.[2]

The Bill of Lading, which listed ASTI as the carrier of the umbrella cartons and named Berkshire as the Bill's "holder," described in general terms how the goods would travel from Taiwan to New York, but not specifically. While the Bill stated that the goods would be loaded onto the ship *M.V. Hakusan II* ("*Hakusan II*") at Keelung, Taiwan on May 17, 1988 and that the place of delivery was New York, it did not specify the means of transporting the containers between those two ports. The Bill neither provided that the *Hakusan II* would transport the umbrellas all the way to New York, nor did it specifically mention land transport. The Bill did, however, have a general "liberties" clause, Clause 20, which allowed the carrier to use any means of transport it saw fit. The Clause states:

(1) The Carrier may at any time and without notice to the Merchant:

(a) use any means of transport or storage whatsoever.

(b) transfer the goods from one conveyance to another including transshipping or carrying the same on another vessel than the vessel named overleaf.

(c) proceed by any route in his discretion (whether or not the nearest or most direct or customary or advertised route) and proceed to or stay at any place or port whatsoever once or more often and in any order.

This Bill of Lading was the only such bill that Berkshire received concerning its purchase of umbrellas from Jiung Chia.

After executing this initial Bill of Lading, ASTI engaged several transport companies in a series of subcontracts designed to guarantee transport of the umbrellas from

---

**2.** Such bills of lading are a common means of arranging sea transport. A freight forwarder, such as ASTI, agrees to arrange for the shipment of goods and arranges for transport, loading, insurance, and customs fees. The shipper then pays a flat fee to the freight forwarder. See William Tetley, *Marine Cargo Claims* 692 (3d ed 1988).

Taiwan to New York. The particular details of these arrangements are neither clear nor, at this point, important. However, three aspects of ASTI's dealings with carriers and other subcontractors merit mention.

First, ASTI contracted with defendant Orient Star Consolidating and Forwarding ("Orient Star"), another shipping agent, for transport of the goods aboard the *Hakusan II.* Orient Star, acting as an agent for ASTI, in turn contacted defendant Nippon Yusen Kaisha ("NYK"), the owner of the *Hakusan II,* and procured NYK's agreement to transport the umbrellas from Taiwan to Los Angeles aboard the vessel. These bills of lading specified the port of delivery as Los Angeles, but Berkshire never received the bills of lading or, indeed, any of the other subcontracts that ASTI or the other agents and subcontractors executed for transport of the umbrellas.

Second, defendant Global contends that ASTI, or one of its subcontractors or agents, entered into a series of subcontracts for rail transport of the umbrellas from Los Angeles to New York. According to Global, the umbrellas were transported by train from Los Angeles to Kearny, New Jersey.

Finally, according to Global, one of the defendant agents or transporters arranged for the umbrellas' storage in Linden, New Jersey at a facility owned by Global. Global contends that it brought the umbrellas from Kearny to its storage facility in Linden. At some point after Global's transfer of the umbrellas from Kearny to Linden but before Berkshire arrived to accept delivery of the umbrellas, Global claims that someone stole the umbrellas from the container yard where Global was storing the cartons. Global argues that the theft occurred because third-party defendant the City of Linden ("the City" or "Linden"), acting through a contractor, third-party defendant Carbro Construction Corp. ("Carbro"), had cut a hole in the fence surrounding the warehouse in connection with the City's installation of a new sewer system. Whatever the reason for the umbrellas' absence, when Berkshire's agents arrived to accept delivery, the goods were missing from the Global warehouse. As noted above, Berkshire denies that the umbrellas ever left Taiwan, and hence it contests all the facts related to the actual transfer of the umbrellas from Taiwan to Linden.

Caught without their umbrellas, defendants encountered this storm of litigation. Berkshire brought suit against ASTI, NYK, the *Hakusan II in rem,* Orient Star, Global, Canopus Ship–Holding S.A., Showa Kaiun, and Cargo Service Inc., all operators of the *Hakusan II,* and J.O.V. Enterprises, Inc., a trucker and warehouser for the umbrellas in New Jersey. Berkshire pled a number of alternative theories: breach of contract, negligence, conversion, breach of warranty, and violation of the duty and obligation of a common carrier and bailee. In its answer to Berkshire's complaint, Global asserted a third-party claim against Carbro Construction and the City of Linden. Global claimed that the City and Carbro's removal of a portion of the fence surrounding the Global warehouse caused the loss of the umbrellas. Global further asserted Global's right to contribution from these two third-party defendants.

■ In the district court, Berkshire invoked admiralty as the basis for subject matter jurisdiction. According to Berkshire, admiralty jurisdiction arises because Berkshire has alleged breach of a maritime contract. Under this theory, the remaining parties and claims are pendent to the admiralty claims. Global moved under Federal Rule of Civil Procedure 12(h)(3) to dismiss the action for lack of subject matter jurisdiction.[3] Reasoning that the Bill was not

---

**3.** Rule 12(h)(3) provides: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." The distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party. See *Rubin v. Buckman,* 727 F.2d 71, 72 (3d Cir.1984). For purposes of this case, the motions are analytically identical because the only consideration is whether subject matter jurisdiction arises.

subject to admiralty jurisdiction because it contained non-maritime elements, the district court granted the motion.

After dismissal, Berkshire sought leave to amend its complaint, pursuant to Federal Rule of Civil Procedure 15(a), to drop a non-diverse party and to assert diversity of citizenship as a basis for subject matter jurisdiction. The district court denied the request to amend because it found the amount in controversy (approximately $42,000 under its reading of the record) to be insufficient and because Berkshire had not alleged diversity in the original complaint as a basis for subject matter jurisdiction. Berkshire also appeals from the order denying its motion to amend.

## II. ADMIRALTY JURISDICTION

### A. *Standards Governing Admiralty Jurisdiction*

We initially consider the law governing admiralty jurisdiction with special attention to disputes about construction of bills of lading. Courts have long recognized that in breach of contract cases, admiralty jurisdiction arises only when the subject matter of the contract is "purely" or "wholly" maritime in nature. See *The Eclipse*, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890); *The Ada*, 250 F. 194, 196 (2d Cir. 1918). See also *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). In other words, when a court finds that the contract solely concerns the operation of a ship or its navigation or management, then the court asserts admiralty jurisdiction over the case. See Elijah Jhirad & Alexander Sann, eds., 1 *Benedict on Admiralty* § 182 at 11–5 (6th ed. 1974).

■ These general principles apply to agency contracts as well. When a shipping agent promises to perform maritime services, courts focus on whether the services scheduled to be performed pursuant to the agency agreement concern maritime activities. Thus, as the Supreme Court has recently explained, the services that the agent promises to arrange are the activities that determine whether the court can exercise admiralty jurisdiction:

> Rather than apply a rule excluding all or certain agency contracts from the realm of admiralty, lower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature.

*Exxon Corp. v. Central Gulf Lines, Inc.*, — U.S. ——, 111 S.Ct. 2071, 2077, 114 L.Ed.2d 649 (1991).

■ Despite the veneration accorded the statement that a contract must be "wholly" maritime for a court to assert admiralty jurisdiction over it, courts have repeatedly qualified that rule in two ways. First, if a contract is partially maritime and partially non-maritime, the court will entertain admiralty jurisdiction if the maritime and non-maritime portions of the contract can be severed without prejudice to either party. See *Flota Maritime Browning de Cuba, S.A. v. Snobl*, 363 F.2d 733 (4th Cir.1966). Second, a federal court may exercise maritime jurisdiction over the entire contract if the non-maritime aspects of the transportation are "merely incidental." See *Kuehne and Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir.1989).

■ We consider these principles in light of the parties' allegations with respect to the Bill of Lading in this case. If we read the contract as one wholly concerning the transport of goods on the sea, we would undoubtedly allow the assertion of admiralty jurisdiction, because contracts purely for transporting goods on water are wholly maritime and thus within the federal courts' admiralty jurisdiction. See *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79, 81 (4th Cir.1967). Global, however, urges that the contract contemplated rail transport of the goods and, hence, is inappropriate for admiralty jurisdiction.

■ While acknowledging that the Bill did not specifically mention land transport, Global submits that the contract implicitly contemplated such transport and further that industry custom alerted plaintiff that the umbrellas would be transported from

Los Angeles to New York via train. Therefore, Global argues that the contract between ASTI and Berkshire was not wholly maritime. Global also contends that the contract does not fall into either of the two exceptions to the "wholly" maritime doctrine. The portion of the contract that is non-maritime was not merely incidental; nor, according to Global, were the non-maritime aspects severable from the maritime aspects of the contract. Asserting that the Bill of Lading does not fall within the rule or any of its exceptions, Global urges that the Bill is not a contract that gives rise to admiralty jurisdiction.

We agree that the Bill, if viewed as a contract for partial sea and partial land transport, would not give rise to admiralty jurisdiction. Certainly such a contract would not be "wholly" maritime in nature as it would call for the transport of the umbrellas across the entire United States.

Moreover, the contract would not fall within either of the two exceptions to the rule that a contract must be wholly maritime. The extensive cross-United States transport of the goods would not be an "incidental" aspect of the contract. Nor could the land and sea portions of the agreement be appropriately severed in this instance. In cases in which there is one bill of lading and one total charge for all the services performed in accord with that bill, courts have generally found the contract non-severable. See, for example, *Alaska Barge & Transport, Inc. v. United States,* 373 F.2d 967, 972, 179 Ct.Cl. 216 (1967). This is so because the consolidation of a number of transport services under one contract at one flat price renders the disentanglement of the various services difficult. Severance would be especially inappropriate in cases such as the present one, in which the party at fault for loss of the goods is unclear and the loss might have occurred during a completely non-maritime portion of the goods' transport. Also, we would have great difficulty determining the rate that Berkshire paid for each of those individual services, and we would therefore be unable to discern obligations under the severed portion of the agreement.

Thus, were we to accept Global's premise regarding the mixed character of the contract, we would hold that it was appropriate for the district court to decline to exercise admiralty jurisdiction since the contract, viewed consistently with that premise, would not be wholly maritime and would not fall within any of the exceptions to the rule that admiralty jurisdiction requires a contract to be wholly maritime.

**B. *Construction of the Contract: Industry Custom and Course of Dealing***

■ Our inquiry, however, does not end there. Instead, we must evaluate Global's underlying premise that the overarching Bill of Lading in this case was actually a contract for both sea transport across the Pacific Ocean and crossland transport across the United States, instead of a contract for sea transport alone.

Given the contract's ambiguity, we must focus our inquiry on the course of dealing between Berkshire and ASTI, and the custom of shippers transporting goods from Taiwan. See *Spartus Corp. v. S/S Yafo,* 590 F.2d 1310, 1313–14 (5th Cir.1979). This approach is consistent with the longstanding judicial practice of interpreting the route of sailing, in the absence of a specified route, to be the normal sailing route as defined by trade practice and custom. See *Hostetter v. Park,* 137 U.S. 30, 38, 11 S.Ct. 1, 3, 34 L.Ed. 568 (1890).

Global contends that the district court has already inquired into the customary practice of trade between Berkshire, Jiung Chia, and ASTI and found, based upon that practice, that the contract called for both land and sea transport. Relying on the testimony of Berkshire's employee, Mindy Bellow, Global argues that "most of the shipments" that Berkshire received from Taiwan came by ship to Los Angeles and then by train from Los Angeles to New York. Therefore, defendants argue that the "customary" practice would have suggested to Berkshire that, regardless of the ambiguous language of the Bill of Lading, the goods would be transported by rail from Los Angeles to New York.

■ However, the evidence considered by the district court was insufficient to establish that combined land and sea transport was part of either the course of dealing between Berkshire and ASTI or consistent with industry custom. While Bellow's testimony demonstrates that goods shipped from Taiwan to Berkshire are frequently transported by both sea and land, her testimony fails to shed light on the specific course of dealing between Berkshire and the other parties involved in this suit. A more searching factfinding may reveal that Berkshire usually engaged freight forwarders in Taiwan who shipped goods to Los Angeles and then sent them by rail to New York, but that Berkshire's relationship with or expectation of ASTI was different. There are simply no facts on record that illuminate either the past course of dealing between the parties in this case or the expectations that the parties reasonably entertained as a result of the bargaining conducted here.

Nor does Bellow's testimony shed light on the usual trade practice and custom involved in shipping goods, particularly umbrellas and similar items, from Taiwan to New York. Again, while Berkshire might have received goods by rail from Los Angeles after shipment there, Berkshire may also have been aware that this practice deviated from the norm in shipping goods from Taiwan to New York. Such shipments might customarily follow an entirely maritime route. Nothing in the record before us demonstrates the contrary. Before the district court declines to exercise admiralty jurisdiction over this case, it must first determine that Berkshire did not have a reasonable belief, based on its prior dealings with the defendants in this case or on usual trade practice and custom, that the goods would travel entirely by sea to New York.

Further factfinding on all these matters will allow the district court to determine whether land transport of the goods was actually what was contemplated by the parties in the Bill.

C. *Potential Bases for Construing the Bill of Lading As a Non–Maritime Contract*

As we have explained, the Bill did not specify the means of transport, and the evidence on industry custom and on the course of dealing between these parties was insufficient to demonstrate conclusively that this was a mixed land and sea contract. In an effort to bolster its premise that the contract called for land transport, Global raises two additional arguments to demonstrate that the Bill of Lading in fact called for transport across the Pacific and then for rail transport across the United States. First, Global argues that the contract allowed at least for the possibility of overland transfer in Clause 20 of the Bill of Lading, the so-called "liberties" clause. That clause permitted ASTI and its agents to "use any means of carriage whatsoever." Global argues that this clause granting unlimited flexibility to ASTI was broad enough to allow for land transport of the umbrellas. If so, Global asserts that the district court cannot exercise admiralty jurisdiction over the contract, since it specifically contemplated the possibility of some 3,000 miles of land transport.

Second, Global argues that Berkshire knew that the only alternative route of transfer—across the Pacific Ocean, through the Panama Canal, and across the Gulf of Mexico, the Carribean Sea, and the Atlantic Ocean—was more cumbersome and more expensive. According to Global, the economic difference between the options should have put Berkshire on notice that the Bill involved rail transport of the umbrellas from Los Angeles to New York.

In a variation on these two themes, the district court reasoned that the containers used to transport the umbrellas were the type of containers used in transport of goods "by ship, rail or truck." According to this theory, Berkshire reasonably should have known that the umbrellas might be transported, at least in part, over land.

We consider each argument in turn.

### 1. The Liberties Clause

Freight forwarders and carriers frequently insert liberties clauses in bills of lading to shield them from liability should they "deviate" from the scheduled course of a voyage and incur damage to the goods that they are carrying. *See* Grant Gilmore & Charles Black, *The Law of Admiralty*, 178 (2d ed 1975). The clauses often allow carriers to deviate from the scheduled route of a voyage for any reason. Courts generally confront such clauses in cases involving goods which have been damaged because of a deviation. The merchant asserts that goods were lost or damaged because the carrier intentionally deviated from the route contracted for in the bill. The carrier responds by asserting that the liberties clause allowed for such deviation.

At common law, deviation from a scheduled voyage stripped a carrier of many of its defenses and made the carrier the insurer of the goods that it was carrying. Courts viewed such deviations as a breach of contract and held carriers liable for the loss of goods resulting therefrom. *See* William Tetley & Steven Cleven, *Prosecuting the Voyage*, 45 Tul.L.Rev. 807, 810 (1971). *See generally* Steven Friedell, *The Deviating Ship*, 32 Hastings L.J. 1535 (1981). To protect against that result, carriers, in negotiating bills of lading, began to contract for liberties clauses, which allowed for deviations and permitted carriers to travel on any route that they saw fit. If the deviation was considered a portion of the parties' agreement, the deviation could no longer be considered a breach of contract. See, for example, *W.R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha*, 7 F.2d 889 (N.D.Cal.1925), aff'd, 12 F.2d 519 (9th Cir.1926).

Responding in part to potential injustices that might result if such open-ended clauses always defeated the claim of deviation and shielded carriers from liability, Congress dealt with the problem in the Carriage of Goods at Sea Act, 46 U.S.C. § 1300–1315 (1988) ("COGSA"). In general, COGSA provides that contract provisions designed merely to defeat liability are not enforceable:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect....

46 U.S.C.App. § 1303(8). More specifically, COGSA forbids deviations from the scheduled voyage that are "unreasonable," regardless of the provisions of the agreement between the parties:

> Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: Provided, however: That if the deviation is for the purpose of loading or unloading cargo or passengers, it shall, prima facie, be regarded as unreasonable.

46 U.S.C.App. § 1304(4).

Thus, COGSA imposes the statutory duty on carriers to deviate only "reasonably" from their voyage regardless of the agreement between the parties contained in their bill of lading. In cases involving assessment of liability, courts have consistently struck down provisions allowing for deviation when they have found that the actual deviation was "unreasonable." See *General Electric Co. v. S.S. Nancy Lykes*, 536 F.Supp. 687, 692 (S.D.N.Y.1982). See also *Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196, 1206 (2d Cir.1975).[4]

> Such conduct [i.e. departing from a customary route] has been held to be a departure from the course of agreed transit and to constitute a "deviation" whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses

---

**4.** Indeed, even prior to the enactment of COGSA, this court recognized that deviation from a voyage must be reasonable. In *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt–Actien–Gesellschaft*, 28 F.2d 249 (3d Cir.1928), we stated:

The *Nancy Lykes* case provides an instructive example of the application of COGSA. In that case, a carrier deviated from its scheduled route to secure fuel. Because the ship had deviated from its route, it later encountered storm gales, which caused it to lose some of the goods it was transporting. The bill of lading between the holder and the carrier contained a liberties clause allowing transport to take place through the "usual, customary, or advertised ports, whether herein named or not, and ports in or out of the advertised, geographic or usual route or order." *Nancy Lykes*, 536 F.Supp. at 692. The carrier claimed that the deviation to secure fuel was reasonable under the bill because the carrier had customarily done so at that port. The carrier further argued that the bill's failure to provide specifically for a stop at that port was therefore irrelevant because such a stop was contemplated under the provision allowing customary stops.

The court rejected the carrier's argument because such a reading would make COGSA's prohibition against unreasonable deviations meaningless. Emphasizing that only reasonable deviations are permissible under COGSA, the court argued that allowing carriers to include such broad provisions would undermine the policy against holding carriers liable for unreasonable deviations. See 536 F.Supp. at 687. Hence, in a case in which "it would seem hard to 'deviate' from ... a voyage," Gilmore & Black, *The Law of Admiralty*, at 178, because of the language of a liberties clause, the court held the clause null and void under COGSA.

In cases involving the assessment of liability against carriers, other courts have also held that only reasonable deviations will be permitted, regardless of the language of the liberties clause. See *Hellenic Lines*, 512 F.2d at 1206 (holding that all deviations must be reasonable, even if literal language of bill of lading would allow for an unreasonable deviation); *P & E Shipping Corp v. Empresa Cubana Exportadora e Importadora de Alimentos*, 335 F.2d 678, 680 (1st Cir.1964) (holding that carrier has burden of proving reasonableness of deviation from usual route regardless of contents of bill of lading). See also Gilmore & Black, *The Law of Admiralty*, at 179 ("It is submitted therefore that the concept of 'reasonable deviation,' ... may be taken as equivalent to 'reasonable departure from the normal course of sailing, or the contract course as defined by a reasonable construction' of the voyage clause.")

In this case, Global claims that the liberties clause allowed for crossland transport of the goods because it permitted ASTI's carriers to "proceed by any route in [their] discretion." Global concedes, for argument's sake, that land transport would be a deviation.[5] According to Global, however, since the contract contemplated that the carrier could deviate by using any route within its discretion, rail transport across the United States was an appropriate deviation under the Bill. Given that the contract allowed for a deviation by rail transport, which Global alleges actually occurred, Global submits that the contract was not a maritime contract and not appropriate for maritime jurisdiction.

of exceptions in bills of lading limiting liability cease to apply. Id. at 251.

5. Courts have articulated the general standard for determining deviation as whether the particular change in route goes beyond the customary course of the voyage. See, for example, *Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1313 (5th Cir.1979). The test for determining whether a deviation is *unreasonable* depends on all the surrounding circumstances, see *Surrendra (Overseas) Private, Ltd. v. S.S. Hellenic Hero*, 213 F.Supp. 97, 101–02 (S.D.N.Y.), aff'd, 324 F.2d 955 (2d Cir.1963) (per curiam); *Nancy Lykes*,

706 F.2d at 85. The standard, however, is strictly construed, see *Ross Industries, Inc. v. M/V Gretke Oldendorff*, 483 F.Supp. 195, 199 (E.D.Tex.1980). In this case, as the facts currently stand, if transport by rail was a deviation, it was almost certainly unreasonable since it does not fall within the limited categories that justify deviation. Those categories are very narrow, see, for example, *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 31 (2d Cir.1986) (holding a deviation reasonable where contracted-for vessel had been requisitioned to serve in the Falklands War), and even the statute on its face makes clear that a deviation merely for unloading would be prima facie unreasonable.

We reject this reading of the Bill of Lading. A liberties clause that allows for any deviation imaginable allows for unreasonable deviations and, consistent with COGSA and the decisions of other courts in cases assessing liability, would be unenforceable. Here, Global attempts to defeat jurisdiction by asserting that the liberties clause permitted all forms of transport, including land transport, and that the Bill's allowance for any means of transport renders it non-maritime. However, as our discussion above suggests, COGSA permits only reasonable deviations; transport across the entire United States under a contract that called only for water transport would be an unreasonable deviation under COGSA. Carriers cannot rely on open-ended liberties clauses, which might within their literal language allow for land transport, to defeat admiralty jurisdiction under the theory that the contract is not then "wholly" maritime.

We thus conclude that the district court, without reliance on Clause 20, should determine whether ASTI's Bill of Lading was a contract for transport of the umbrellas by sea exclusively or by sea and land. As we have already suggested, such a determination is best made by reference to whether the route in fact used (Keelung to Los Angeles to New York) was in fact customary. See *Nancy Lykes*, 706 F.2d at 85.

2. Alternative Routes of Transport

The district court also found, and Global now argues, that a purely maritime route would be so obviously cumbersome as to preclude Berkshire from reasonably believing that the Bill of Lading called for such transport. This conclusion apparently stems from Global's sense that the purely maritime route is elongated and therefore is not the route that any two parties would contract for. Absent additional factfinding, we find this argument unpersuasive.[6] If, for example, the payment that ASTI and Berkshire agreed to corresponded with the usual price for partially maritime/partially land transport of the umbrellas, then such a finding would be reasonable. In the absence of additional evidence, however, we cannot declare the assertion of admiralty jurisdiction inappropriate where the course of dealing between the parties as well as the specific terms of this agreement may have led Berkshire reasonably to believe that the method of transport would be completely maritime.

3. Containers Used in Transport

Finally, the district court reasoned that the containers used in transporting the umbrellas were containers commonly used in land transport of goods. The district court concluded that, given the use of the containers, Berkshire should have predicted that transfer by rail was a reasonable possibility, especially in light of the economic reality that transfer by rail was preferable.

This reasoning is unpersuasive on two counts. First, as the district court's opinion acknowledged, the containers used in this case are also commonly used in ocean transport of goods. Although Berkshire might have foreseen land transport of the goods, nothing about the containers themselves should have indicated that the journey would necessarily involve land transport. Second, the district court's holding would effectively remove all shipping agreements involving such containers from the admiralty jurisdiction of the federal courts because parties would be expected to foresee that such containers might be used on land, regardless of the method of transport for which the parties actually contracted.[7] We reject such a broad rule

6. We note that the district court's finding on this subject may not be justified by judicial notice. Although the court is free to take notice of the distance of the alternate maritime route, see *Spearing v. Manhattan Oil Transp. Corp.*, 375 F.Supp. 764, 769 (S.D.N.Y.1974) (judicially noticing a geographical distance), it is inappropriate to notice judicially that parties would never contract for shipment over that geographical distance. Federal Rule of Evidence 201(b) for-

bids judicial notice of facts subject to reasonable dispute or of facts not capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Those requirements are not met here.

7. The cases to which the district court cited in support of its conclusion that this was a mixed land/sea contract do not support that conclusion. In *CTI–Container Leasing v. Oceanic Op-*

and find that despite the use of containers, if the parties have negotiated for a purely maritime contract, a court should not decline jurisdiction merely because containers were used in transport.

### D. *Conclusion*

For the foregoing reasons, we must reverse the judgment and remand for further fact finding on the issue of admiralty jurisdiction because the intent of Berkshire, Ji-ung Chia, and ASTI in entering into the overarching Bill of Lading is unclear and should be fully explored.[8] The district court should determine whether, in executing the initial Bill of Lading, the parties entertained a reasonable expectation of only maritime transport of the umbrellas. Such a finding would allow the court to assert admiralty jurisdiction. If the Bill allowed for the possibility of both land and sea transport, then the district court should decline to assert admiralty jurisdiction.

### III. DIVERSITY JURISDICTION

Berkshire also appeals the district court's order denying its motion to amend its complaint. Berkshire's first amended complaint had named among the defendants Y.F.K. Cargo Service, Inc., a New York corporation. The presence of YFK in the suit destroyed complete diversity between the parties and prevented Berkshire from asserting diversity as a basis for federal jurisdiction. See *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435

(1806). To cure this problem, Berkshire moved in its reargument motion to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a). Berkshire's amendment proposed to drop YFK from the suit.

Rule 15(a) permits one amendment of a complaint as of right, provided the opposing party has not served a responsive pleading. The Rule provides that after one amendment, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." FRCP 15(a). In this case, responsive pleadings had already been filed before Berkshire sought to amend. Hence, our review is of a discretionary decision of the district court to deny leave to amend and our standard of review is abuse of discretion. See *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Adams v. Gould, Inc.*, 739 F.2d 858, 863 (3d Cir.1984). Nonetheless, we note that "the district court's exercise of discretion ... must be within the law," 739 F.2d at 863–64, and that the discretion should be exercised within the context of liberal pleading rules. Specifically, the district court may deny a leave to amend only where in its discretion the district court finds that the plaintiff's delay in seeking the amendment is undue, made in bad faith, prejudicial to the opposing party, or fails to cure the jurisdictional defect. See

---

erations, 682 F.2d 377 (2d Cir.1982), the Second Circuit determined that containers might be used in overland and oversea transportation but specifically found on the facts of that case that the kind of transport contemplated was sea transport. Similarly, *Itel Containers Intern. v. Atlantrafik Exp. Serv.*, 668 F.Supp. 225 (S.D.N.Y. 1987), discussed extensively the development of containers in the maritime industry, but it did not find that a presumption should exist in every case involving land containers that a party should reasonably foresee such land transport. *Luvi–Trucking, Inc., v. Sea–Land Service, Inc.*, 650 F.2d 371 (1st Cir.1981), involved a contract specifically for the transport of goods across land; the method of packaging the goods was irrelevant to the disposition of the case.

**8.** We note that Berkshire has argued that the district court has pendent-party jurisdiction over the claims against defendants Global and

Jo–Lin. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (granting federal jurisdiction over state law claims that arise from the same "common nucleus of operative fact" as the federal claims). Global responds that pendent-party jurisdiction is inappropriate under *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (denying pendent-party jurisdiction under the Federal Tort Claims Act). We do not decide this issue because we do not decide the predicate issue whether admiralty jurisdiction exists, but we do note that in response to *Finley*, Congress has enacted legislation granting the federal courts supplemental jurisdiction over claims such as this. See Pub.L. No. 101–650, 104 Stat. 5089 (October 27, 1990). Because this legislation is prospective, however, the court must decide the matter on the prior case law.

*Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938 (3d Cir.1984); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir.1983). The district court provided two reasons for its denial of leave to amend. First, the district court stated that diversity jurisdiction had not been alleged "as a basis for jurisdiction in the original complaint." Presumably the district court believed that, at least in this case, Berkshire's failure to assert diversity as a basis for jurisdiction in its original complaint precluded Berkshire from ever asserting diversity as a basis for subject matter jurisdiction.

We know of no absolute prohibition against asserting another basis for jurisdiction in an amendment to a pleading, provided that such jurisdiction would have existed at the time the complaint was originally filed. Many circuits have held that no such prohibition exists. See *Miller v. Stanmore*, 636 F.2d 986 (5th Cir.1981); *John M. Peters Constr. Co. v. Marmar Corp.*, 329 F.2d 421 (6th Cir.1964); *United Steelworkers of America, AFL–CIO v. Mesker Bros. Industries, Inc.*, 457 F.2d 91 (7th Cir.1972); *Local 179, United Textile Workers of America, AFL–CIO v. Federal Stock Paper Co.*, 461 F.2d 849 (8th Cir.1972); *May Department Store v. Graphic Process Co.* 637 F.2d 1211 (9th Cir.1980).[9]

The rationale for this construction of Rule 15 stems from the liberal approach to amendment embodied in judicial interpretation of the rule. See *Miller*, 636 F.2d at 991. In sum, nothing prevents a district court from granting a party leave to amend its complaint to assert a new basis for subject matter jurisdiction, provided that the amendment is not unduly delayed, advanced in bad faith, or prejudicial to the opposing party, and none of those factors is present here. Indeed, after amendment, the only difference will be the absence of one of the parties previously in the suit.

■ As a second rationale for refusing to grant leave to amend, the district court reasoned that the amount in controversy

did not exceed $50,000, the statutorily prescribed amount for diversity jurisdiction as of May 18, 1989. See 28 U.S.C.A. § 1332 (West Supp.1991). The district court explained more fully in its opinion denying reconsideration that "the total claim is less than $42,000.00." Before May 18, 1989, the statutorily required amount for subject matter jurisdiction in a suit between diverse parties was $10,000. See 28 U.S.C. § 1332 (1988) (amended effective May 18, 1989). After that date, the required amount has been $50,000. See 28 U.S.C. § 1332 (West Supp.1991). The original complaint in this action was filed on December 23, 1988. Given these facts, the question becomes whether Berkshire's proposed amendment would relate back to the date of the original complaint. If so, Berkshire need allege damages only in an amount greater than $10,000.

■ We hold that Berkshire's proposed amendment dropping YFK from the suit relates back to December 23, 1988, the date of the original complaint. This practice is consistent with the requirement of Rule 15(c), which provides in relevant part:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

FRCP 15(c). Relation back to the date of the original filing applies even when the amendment states a new basis for subject matter jurisdiction. See *Burnstein v. Columbia Broadcasting Sys., Inc.*, 291 F.2d 8, 9–10 (7th Cir.1961) (relating back amendment to perfect subject matter jurisdiction).

In cases involving amendment for subject matter jurisdiction, courts have usually given the amendment retroactive effect. See, for example, *South Carolina Elec. & Gas Co. v. Ranger Constr. Co., Inc.*, 539 F.Supp. 578 (D.S.C.1982). The rule should be the same where Congress has raised the

---

**9.** We also note that the district courts in this circuit have followed this rule. See, for example, *Doran v. Lee*, 287 F.Supp. 807, 813 (W.D.Pa.

1968) (allowing for amendment to assert diversity as a jurisdictional basis where court found that it lacked admiralty jurisdiction).

amount-in-controversy requirement.[10] Because the amount in controversy required at the time Berkshire filed its original complaint was only $10,000, the damages alleged here clearly exceed the statutory minimum. Thus, the district court erred in assuming that the requisite amount in controversy for this suit is $50,000.

 We do not decide, however, that diversity jurisdiction would actually exist. If Berkshire amends its complaint to assert diversity jurisdiction, the district court must still determine whether $10,000 is not only alleged but is validly in controversy.[11]

## IV. CONCLUSION

The order of the district court dismissing the complaint will be reversed and the case remanded for further fact finding and reconsideration of whether admiralty jurisdiction exists. The district court's order denying plaintiff's motion for reconsideration will also be reversed so that plaintiff might have an opportunity to amend to allege diversity jurisdiction.

10. The cases Global cites to support the opposite rule are unpersuasive. Those cases deal with the problem of what the governing amount in controversy should be in cases in which defendants remove an action from state court to federal court. See *Sayers v. Sears, Roebuck,* 732 F.Supp. 654, 655–56 (W.D.Va.1990). Some courts have held that the relevant time is the time that the case is initially filed in state court, see *Kieffer v. Travelers Fire Insurance Co.,* 167 F.Supp. 398 (D.Md.1958). Other courts have held that the amount should be measured at the time the case is actually removed to federal court. See *Lorraine Motors, Inc. v. Aetna Casu-* alty & Surety Company, 166 F.Supp. 319 (E.D.N.Y.1958). Those cases do not involve Rule 15, which explicitly states that amendments should relate back, and thus provides clear guidance about the appropriate date to use to determine the governing law.

11. We find it necessary to remand on this issue because the district court did not appear to make a specific finding as to the amount in controversy. Although the court mentioned that Berkshire had "conceded" that $42,000.00 was in controversy, no specific facts were found to substantiate that amount.